U. S. EQUAL EMPLOYMENT OPPOR-
TUNITY COMMISSION, Plaintiff,

v.

COUNTY OF CALUMET, Defendant.

Civ. A. No. 81–C–402.

United States District Court,
E. D. Wisconsin.

June 12, 1981.

On Motion to Amend June 26, 1981.

Dorothy Famber and Lloyd Zimmerman, E. E. O. C., Milwaukee, Wis., for plaintiff.

David L. Uelmen, Goldberg, Previant, Uelmen, Gratz, Miller, Levy & Brueggeman, S. C., Milwaukee, Wis., for defendant.

Sandra Neese, Regional Atty., Thomas Nelson, Supervisory Trial Atty., and Dorothy Famber and Lloyd Zimmerman, Senior Trial Attys., Milwaukee, Wis., for EEOC on motion to amend.

## DECISION and ORDER

TERRENCE T. EVANS, District Judge.

After the grant of a preliminary injunction, this matter is before the court on a challenge to the constitutionality of § 11(b) of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 630(b).

The U. S. Equal Employment Opportunity Commission (EEOC) brought this action on behalf of Ruth Schabach, who has been the Deputy Clerk of Court for Calumet County, Wisconsin, since March 1, 1973. Schabach, who was born on March 30, 1916, became 65 years old on March 30, 1981. On March 27, 1981, the County Salary and Personnel Committee informed her that she would be required to retire at 65, despite her desire to continue working. The county extended her employment until April 30, 1981, so that she could train her replacement.

The county, which agrees that Schabach is competent in her work, based its action on § 26 of the Calumet County Personnel Policy, which states: "All non-elected participating employees of the County shall have their employment terminated at such age as conforms with Wisconsin Retirement Fund regulations ...." Wis.Stats. § 41.-02(23) sets 65 as the "normal retirement date" for the position of deputy clerk of court. Wis.Stats. § 41.11(1) provides that county employees "may be retired by the employer after the employe attains his or her normal retirement [age] ... except as prohibited by federal law." Not at issue here is the ADEA provision allowing forced early retirement where age is a "bona fide occupational qualification."

On April 7, 1981, Schabach filed a charge of age discrimination with the EEOC to challenge her forced retirement. The EEOC notified the county of the charge on April 8, 1981, and undertook investigation and conciliation. All administrative prerequisites to the filing of this suit have been satisfied.

On April 20, 1981, the EEOC filed this action, seeking a temporary restraining order and a preliminary injunction to restrain the county from retiring Schabach on April 30, 1981. On April 27, 1981, after hearing oral argument from counsel for both parties, I preliminarily enjoined the county from terminating Schabach's employment due to her age pending the outcome of this litigation. An expedited briefing schedule was established, with the last submission received on June 1, 1981. The matter is now ready for a decision.

## I

Title VII of the Civil Rights Act of 1964 banned discrimination by private employers on the basis of race, color, religion, sex, or national origin. 42 U.S.C. §§ 2000e–2000e–17. Senator Javits' proposal that Title VII also ban age discrimination was rejected, but § 715 of the Act directed the Secretary of Labor to study the problem and report to Congress. After the Secretary submitted his report, the Senate in 1966 passed Pub.L. 89–601, which amended the Fair Labor Standards Act (FLSA) of 1938 to ban age discrimination. The Conference Committee eliminated that provision, but § 606 of Pub.L. 89–601 directed the Secretary of Labor to submit to the President "his specific legislative recommendations for implementing the conclusions" in his report. In his January 23, 1967, "Older Americans" message, President Johnson recommended to Congress passage of amendments that became the ADEA. See Arritt v. Grisell, 567 F.2d 1267, 1270 n.11 (4th Cir. 1977).

When the ADEA was enacted on December 15, 1967, Congress declared that

"It is therefore the purpose of this Act to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b) (emphasis added).

Thus, the ADEA's central purpose is to prohibit age discrimination in employment. The power to do so would seem to arise from Congress' power under § 5 of the Fourteenth Amendment "to enforce, by appropriate legislation," that amendment's provision of equal protection to citizens against intrusion by the states. As passed in 1967, however, the ADEA was based on the Commerce Clause, U.S.Const. Art. I, § 8, cl. 3, because only private employers were then covered by the Act. See 29 U.S.C. § 621(a)(4). Similarly, the Civil Rights Act of 1964, as applied to private employers, was upheld by the Supreme Court as based on the Commerce Clause. Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); Heart of Atlanta Motel v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964).

In Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), the Supreme Court held that the 1972 amendments that extended Title VII's protections against discrimination to state and local government employees were validly enacted under § 5 of the Fourteenth Amendment.

Thus, through the Fourteenth Amendment, Congress may forbid employment discrimination by state and local governments against their employees despite the Tenth Amendment's protection of state sovereignty.

Of course, age discrimination is prohibited by the ADEA, not Title VII. However, "[t]here are important similarities between the two statutes, to be sure, both in their aims—the elimination of discrimination from the workplace—and in their substantive prohibitions. In fact, the prohibitions of the ADEA were derived *in haec verba* from Title VII." *Lorillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978). "Resemblances between these two acts have prompted courts to interpret one act by resort to the other for clarification and assistance." *Carpenter v. Pennsylvania Liquor Control Bd.*, 25 EPD ¶ 31,653, at p. 19,773 (E.D.Pa.1981). *Accord, Ciccone v. Textron*, 25 EPD ¶ 31,598 (2d Cir. 1981) (construing ADEA timeliness requirements in light of Title VII timeliness requirements).

In 1974, Congress enacted Pub.L. 93–259, entitled "Fair Labor Standards Amendments of 1974." Every section but one amended the FLSA. The remaining section extended the coverage of § 11(b) of the ADEA, 29 U.S.C. § 630(b), to state and local government employees:

"Section 28. Nondiscrimination on Account of Age in Government Employment.—This section amends the Age Discrimination in Employment Act of 1967. The amendments to the Act (1) change the number of employees an employer is required to have to be subject to the Act from 25 employees to 20 employees for each working day in each of 20 or more calendar weeks in a year; and (2) expand the coverage of the Act to Federal, State, and local employees. The Act prohibits discrimination in employment on the basis of age in matters of hiring, job retention, compensation, and other terms, conditions or privileges of employment. Protection under the Act is limited to the individuals who are between the ages of 40 and 65." 1974 U.S.Code and Congressional News, Vol. 2, pp. 2811, 2860.

Despite the ADEA's adoption of the FLSA enforcement provisions, *see* 29 U.S.C. § 626(b), the prohibition of age discrimination results from the ADEA, not the FLSA. As noted above, that prohibition was lifted from Title VII. Thus, the 1974 amendment of § 11(b), in extending ADEA protections to state and local employees, can be seen as the exercise of Congress' Fourteenth Amendment enforcement power rather than its commerce power.[1]

---

1. The County argues, citing *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), that "the federal government and the state government may classify citizens according to their 'age' without violating any constitutional rights." Thus, it contends, Congress could not have passed the ADEA pursuant to its Fourteenth Amendment enforcement power because it "knew" that such an action would put it "clearly in conflict with established constitutional law." Defendant's brief at 3, 11.

In *Murgia*, the Supreme Court held that "the Massachusetts statute clearly meets the requirements of the Equal Protection Clause, for the State's classification rationally furthers the purpose identified by the State: Through mandatory retirement at age 50, the legislature seeks to protect the public by assuring physical preparedness of its uniformed police." *Id.* at 314, 96 S.Ct. at 2567. Thus, the Court decided that old age is not a "suspect class" requiring "strict scrutiny of a legislative classification." *Cf. McMahon v. Barclay*, 510 F.Supp. 1114 (S.D.N.Y.1981) (State law forbidding hiring of police officers over age of 29 violates equal protection).

The fact that the Court analyzed the Massachusetts age classification under the "rational basis" test was not a ruling that Congress or a state legislature could not act to prohibit age discrimination. In fact, the Court stated that the rational basis analysis

". . . employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary. *Such action by a legislature is presumed to be valid.*" *Id.* at 314, 96 S.Ct. at 2567 (emphasis added).

Furthermore, Congress often passes legislation under its Fourteenth Amendment power to prohibit discrimination that the Constitution would otherwise permit. For example, in *Geduldig v. Aiello*, 417 U.S. 484, 488, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), the Supreme Court held

Calumet County, however, contends that § 11(b) cannot be considered to have been amended pursuant to § 5 of the Fourteenth Amendment unless Congress explicitly stated so. For support, it turns to *Pennhurst State School & Hosp. v. Halderman,* —— U.S. ——, ——, 101 S.Ct. 1531, 1538, 67 L.Ed.2d 694 (1981), where the Supreme Court stated:

"In discerning congressional intent, we necessarily turn to the possible sources of Congress' power to legislate, namely, Congress' power to enforce the Fourteenth Amendment. . . .

". . . Because such legislation imposes congressional policy on a State involuntarily, and because it often intrudes on traditional state authority, we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment. Our previous cases are wholly consistent with that view, since Congress in those cases expressly articulated its intent to legislate pursuant to § 5. See *Katzenbach v. Morgan, supra* (intent expressly stated in the Voting Rights Act of 1965); *Oregon v. Mitchell, supra,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (intent expressly stated in the Voting Rights Act amendments of 1970); *Fitzpatrick v. Bitzer, supra,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (intent expressly stated in both the House and Senate reports of the 1972 Amendments to the Civil Rights Act of 1964); cf. *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d. 769 (1966) (intent to enforce the Fifteenth Amendment expressly stated in the Voting Rights Act of 1965). Those cases, moreover, involved statutes which simply prohibited certain kinds of state conduct. The case for inferring intent is at its weakest where, as here, the rights asserted impose *affirmative* obligations on the

States to fund certain services, since we may assume that Congress will not implicitly attempt to impose massive financial obligations on the States." (Emphasis in original).

In the next section of the opinion, however, the Court states:

"Applying those principles to this case, we find nothing in the Act or its legislative history to suggest that Congress intended to require the States to assume the high cost of providing 'appropriate treatment' in the 'least restrictive environment' to their mentally retarded citizens.

"There is virtually no support for the lower court's conclusion that Congress created rights and obligations pursuant to its power to enforce the Fourteenth Amendment. The Act nowhere states that that is its purpose. Quite the contrary, the Act's language and structure demonstrate that it is a mere federal-state funding statute. The explicit purposes of the Act are simply 'to assist' the States through the use of federal grants to improve the care and treatment of the mentally retarded. § 6000(b). Nothing in either the 'overall' or 'specific' purposes of the Act reveals an intent to require the States to fund new, substantive rights. Surely Congress would not have established such elaborate funding incentives had it simply intended to impose absolute obligations on the States." *Id.* at ——, 101 S.Ct. at 1540.

Thus, the ADEA's legislative history must be searched for evidence of Congress' intent to ground the 1974 ADEA amendment on its Fourteenth Amendment enforcement power.

The legislative history is rife with indications that Congress did indeed intend to exercise its Fourteenth Amendment enforcement power in amending § 11(b):

that a State disability insurance plan that excluded pregnancy benefits was a rational classification that did not violate equal protection. In 1978, Congress amended Title VII to add § 701(k), which makes unlawful disability plans that exclude pregnancy benefits. 42 U.S.C. § 2000e(k). Similarly, in *Goesart v. Cleary,* 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163 (1948), the

Supreme Court upheld under the equal protection clause a State "protective" statute that discriminated on the basis of sex, but the Seventh Circuit in *Williams v. General Foods,* 492 F.2d 399, 404 (7th Cir. 1974), ruled that Title VII had prohibited further reliance on protective statutes.

"NONDISCRIMINATION ON ACCOUNT OF AGE IN GOVERNMENT EMPLOYMENT

"The bill amends the Age Discrimination in Employment Act of 1967 to include within the scope of its coverage Federal, State, and local government employees (other than elected officials and certain aides not covered by civil service) and to expand coverage from employers with 25 or more employees to employers with 20 or more employees. . . .

"The ADEA prohibits discrimination in employment on the basis of age in matters of hiring, job retention, compensation, and other terms, conditions or privileges of employment. Protection under the Act is limited to individuals who are between the ages of 40 and 65.

"As the President said in his message of March 23, 1972, supporting such an extension of coverage under the ADEA, '*Discrimination based on age*—what some people call ageism—*can be as great an evil in our society as discrimination based on race or religion* or any other characteristic which ignores a person's unique status as an individual and treats him or her as a member of some arbitrarily defined group. Especially in the employment field, discrimination based on age is cruel and self-defeating; it destroys the spirit of those who want to work and it denies the Nation the contribution they could make if they were working.

\* \* \* \* \* \*

"The committee expects that expanded coverage under the Age Discrimination in Employment law will remove discriminatory barriers against employment of older workers in government jobs at the Federal and local government levels as it has and continues to do in private employment." 1974 U.S.Code, Cong. and Admin. News, p. 2849 (emphasis added).

Congress amended the ADEA again in 1978 to raise the protected retirement age from 65 to 70 and to prohibit forced retirement based on a retirement plan. The 1978 amendments are particularly relevant because the county seeks to retire Ruth Schabach at age 65 based on a retirement plan. Because the county's intended actions here were not illegal until the 1978 amendments, the legislative history of those amendments is instructive.

The "Forward" to the August, 1977 Report by the Senate Committee on Aging, "Mandatory Retirement: The Social and Human Cost of Enforced Idleness," concluded that the "practice of age-based mandatory retirement is arbitrary and unwarranted. It is as odious as discrimination based on race and sex." The Senate Report went to bolster the ADEA's Fourteenth Amendment underpinnings:

"CONSTITUTIONALITY

"*The Age Discrimination in Employment Act of 1967 has close ties to the Civil Rights Act of 1964.* Section 715 of the 1964 act directed the Secretary of Labor to make a study of the problem of age discrimination in employment. The study resulted in a report and recommendation for legislation to eliminate arbitrary age discrimination in employment and the passage of the 1967 act. . . .

"From the evidence presented, the committee concludes that '*age*' *should be as protected a classification as race and sex.* The argument that everyone ages and no particular group is singled out for discrimination ignores the fact that discrimination solely on the basis of age is wrong. If mandatory retirement because of age—the final step in the practice of age discrimination—is not to be declared unconstitutional by the Courts, then Congress should act to make such a practice illegal. Any compelling argument for mandatory retirement must be balanced against the cost such retirement exacts in the lives of elderly persons, and the arguments in favor of mandatory retirement do not justify the existence of this discriminatory practice." *Id.* at 37–38 (emphasis added).

The House of Representatives Committee on Human Resources stated:

"The committee believes that *as a matter of basic civil rights people should be treated in employment on the basis of*

*their individual ability to perform a job rather than on the basis of stereotypes about race, sex, or age.* A person with the ability and desire to work should not be denied that opportunity solely because of age." Report 95–493 of the House Committee on Human Resources, October 12, 1977 (BNA reprint, p. 151) (emphasis added).

In the same report, Senators Cranston and Riegle of the Senate Human Resources Committee declared:

"The Age Discrimination in Employment Act is a cornerstone in our national commitment to secure the basic rights of all citizens, including older Americans. Age discrimination, like other forms of arbitrary discrimination, is contrary to our fundamental principles of equal treatment and equal rights for all Americans...." *Id.* at 184.

The July 25, 1977 Report (95–527) of the House Committee on Education and Labor reflects similar Fourteenth Amendment concerns:

"There have been several conflicting court decisions recently regarding the constitutionality of Federal mandatory retirement requirements, and the interpretation of the exception in the Age Discrimination in Employment Act relating to employee benefit plans. The differing opinions relating to the laws and Congress' intent with regard to these laws makes it even more important for Congress to act on this issue. It should be emphasized that the current Age Discrimination in Employment Act and these amendments apply to State and local government employees. Although in *National League of Cities, et al. v. Usery* [426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976)], the U. S. Supreme Court determined that Federal statutory minimum wage and overtime requirements cannot be applied to State and local governments because it would infringe on the rights of States and localities to regulate the terms and conditions of employment of their own employees, in several lower court cases decided since that time, the courts have all held that the ruling in the League of Cities case does not apply to federal laws prohibiting employment discrimination." BNA reprint, pp. 105–106.

By this point, it should be unnecessary to cite the many other references in the legislative history to show that Congress, when it passed the 1978 ADEA amendments, considered age discrimination a denial of equal protection. Thus, although the ADEA itself does not explicitly state that the 1974 and 1978 amendments extended ADEA protections to state and local government employees pursuant to Congress' Fourteenth Amendment enforcement power, the legislative history is more than sufficient to reach that conclusion. *Cf. Pennhurst, supra* —— U.S. at ——–——, 101 S.Ct. at 1538.[2]

Furthermore, as the Report of the House Committee on Education and Labor pointed, several other courts have decided that § 11(b) was validly extended to state and local governments pursuant to § 5 of the Fourteenth Amendment despite *National League of Cities. See Arritt, supra; EEOC v. Elrod*, No. 79–C–4120 (N.D.Ill. 9/17/80), *appeal to Seventh Circuit pending; Carpenter, supra; Marshall v. Delaware River & Bay Auth.*, 471 F.Supp. 886 (D.Del.1979); *EEOC v. Florissant Valley Fire Protection Dist.*, 21 EPD ¶ 30,520 (E.D.Mo.1979); *Remmick v. Barnes County*, 435 F.Supp. 914 (D.N.D.1977); *Aaron v. Davis*, 424 F.Supp. 1238 (E.D.Ark.1976); *Usery v. Board of Educ. of Salt Lake City*, 421 F.Supp. 718 (D.Utah 1976).

■ *National League of Cities* held unconstitutional the extension of the FLSA minimum wage and overtime provisions to state and local employees, an extension made in the same 1974 law that extended ADEA protections to those employees.

---

**2.** In Section 2 of Reorganization Plan No. 1 of 1978, 43 F.R. 19807, 92 Stat. 3781, President Carter, with Congressional approval, transferred ADEA enforcement functions from the Department of Labor to the EEOC. This transfer seems a further governmental acknowledgement that age discrimination closely resembles discrimination on the basis of race, color, religion, sex, or national origin, and thus, by implication, was prohibited pursuant to Congress' Fourteenth Amendment enforcement power.

Pub.L. 93–259. The Supreme Court ruled that requiring state and local governments to meet federal wage and hour guidelines was an impermissible interference with "the States' freedom to structure integral operations in areas of traditional governmental functions...." *Id.* at 852, 96 S.Ct. at 2474. In other words, Congress may not use its power to regulate commerce, to interfere with powers reserved to the states under the Tenth Amendment. Nevertheless, as the Supreme Court held in *Fitzpatrick, supra* at 456, 96 S.Ct. at 2671, "... Congress may, in determining what is 'appropriate legislation' for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts." [3] The reason for this was made clear in *Board of Education of Salt Lake City, supra* at 719:

> "The Court in *National League of Cities* ... was not confronted with an allegation of discrimination against specific individuals in the application of minimum wages and maximum hours, but the Court analyzed and rejected the organic restructuring by Congress of what was properly and traditionally a state function in organizing employer-employ-

ee relations. Acknowledging that public education may be an integral state government function, such a state function must operate within constitutional bounds. Individuals within those state systems continue to enjoy constitutionally guaranteed rights which are statutorily protected in such federal legislation as the ADEA. Otherwise, *National League of Cities*, so interpreted, would undermine constitutionally and statutorily recognized and protected individual rights in employment merely because the federal legislation affects, in some manner, an integral state governmental function. Such an absolute interpretation would itself derogate from the federal system by unduly restricting congressional power to statutorily protect individual rights in employment in which the federal government has a significant interest."

Thus, *National League of Cities* is inapplicable to the present situation. Having legislated pursuant to its Fourteenth Amendment enforcement power, Congress acted constitutionally in prohibiting age discrimination by state and local governments.[4]

## II

Even if Congress had acted only pursuant to its power to legislate under the

**3.** In *National League of Cities, supra* at 852 n.17, 96 S.Ct. at 2474 n.17, the Supreme Court stated: "We express no view as to whether different results might obtain if Congress seeks to affect integral operations of state governments by exercising authority granted it under other sections of the Constitution such as the Spending Power, Art. I, § 8, cl. 1, or § 5 of the Fourteenth Amendment." *Fitzpatrick*, decided shortly after *National League of Cities*, may be seen as the Supreme Court's "view" of the question left undecided in the earlier case. *See, e. g., Board of Education of Salt Lake City, supra* at 721.

**4.** As noted, over time Congress has changed the number of employees necessary to bring an employee under the ADEA and the categories of employees covered by the Act, as well as raising the retirement age from 65 to 70. Because the ADEA does not "secure *constitutional* rights of *all* citizens of the country," the County argues, it could not have been enacted pursuant to § 5 of the Fourteenth Amendment. However, as the Supreme Court stated in *Katzenbach v. Morgan*, 384 U.S. 641, 657, 86 S.Ct. 1717, 1727, 16 L.Ed.2d 828 (1966),

"[I]n deciding the constitutional propriety of the limitations in such a reform measure we are guided by the familiar principles that a 'statute is not invalid under the Constitution because it might have gone farther than it did,' * * *, that a legislature need not 'strike at all evils at the same time,' * * *, and that 'reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.' * * *"

Congress enacted the ADEA after long and careful study. As the House Committee on Human Resources stated in its 1977 report, "When the Age Discrimination in Employment Act was enacted in 1967, comparatively little was known about the desires or abilities of older workers.... In the ensuing decade, however, much of this uncertainty has been resolved. Scientific research now indicates that chronological age alone is a poor indicator of ability to perform a job." Report 95–493 of the House Committee on Human Resources, October 12, 1977 (BNA reprint, p. 152).

Commerce Clause, the ADEA may be constitutionally applied to state and local governments.

As noted above, the Supreme Court in *National League of Cities, supra,* struck down the extension of federal wage and hour guidelines to state and local governments, based on the Tenth Amendment, "which expressly declares the constitutional policy that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system." *Id.* at 843, 96 S.Ct. at 2475, *quoting Fry v. United States,* 421 U.S. 542, 547 n.7, 95 S.Ct. 1792, 1795 n.7, 44 L.Ed.2d 363 (1975). Thus, when Congress has acted pursuant to its commerce power, the question is whether Calumet County's establishment of a particular retirement age is a function "essential to [its] separate and independent existence." *National League of Cities, supra* at 845, 96 S.Ct. at 2471, *quoting Coyle v. Oklahoma,* 221 U.S. 559, 580, 31 S.Ct. 688, 695, 55 L.Ed. 853 (1911), *and Lane County v. Oregon,* 74 U.S. 71, 7 Wall. 71, 76, 19 L.Ed. 101 (1869).

The county does not dispute that Ruth Schabach competently performs her work. Its attempt to force her retirement is based on the arbitrary decision that 65 is the proper age at which to discharge all employees, regardless of individual vigor or competence. Yet, the ADEA's prohibition of arbitrary age discrimination does not affect the county's ability to force the early retirement of employees, like police officers, for whom age is a "bona fide occupational qualification." *See* 29 U.S.C. § 623(f)(1). The county is free to classify all employees according to reasonable factors other than age, 29 U.S.C. § 623(f)(2), and may "discharge or otherwise discipline an individual for good cause." 29 U.S.C. § 623(f)(3).

The State of Wisconsin itself prohibits age discrimination by the state and its counties against employees 40 to 65 years old. Wis.Stats. § 111.32. Furthermore, while the "normal retirement date" for the position of deputy clerk of court is 65, Wis. Stats. § 41.11(1) forbids forced retirement where "prohibited by federal law." Thus, the Wisconsin Statutes themselves indicate that age discrimination violates state policy and serves no sovereign state function.

In *Marshall v. City of Sheboygan,* 577 F.2d 1, 6 (7th Cir. 1978), the Seventh Circuit upheld the Equal Pay Act under the Commerce Clause after determining that that Act "requires only that the substantive terms of employment not be determined arbitrarily or in a discriminatory fashion." The Equal Pay Act, like the ADEA, was applied to the States as part of the Fair Labor Standard Amendments of 1974. The Seventh Circuit, after reviewing *National League of Cities,* concluded that employment discrimination is not "essential to [the States'] separate and independent existence." *Id.* at 5–6. Applying the Court's words to the present case, "States are free to set all substantive terms of employment, such as wages, type of compensation, or period of employment. The [ADEA] requires only that the substantive terms of employment not be determined arbitrarily or in a discriminatory fashion." *Id.* at 6.

Accordingly, Congress' extension of the ADEA to state and local governments is a valid exercise of its commerce power, and the exercise of that power is not prohibited by the Tenth Amendment. *Accord, Board of Education of Salt Lake City, supra* at 720; *Delaware River & Bay Auth., supra* at 892; *Elrod, supra* at 2.

### III

 Regardless of the outcome of the constitutional determination, Calumet County argues that the collective bargaining agreement contains an implied consent that employees will retire at the "normal" retirement age.

The deputy clerk of court is part of the collective bargaining unit. The collective

---

Congress waited 100 years after adoption of the Fourteenth Amendment to enact Title VII. It did not apply Title VII to state and local governments until 1972. Congress created exceptions to Title VII, as it has done under the ADEA. "Deliberate speed" does not detract from the Congress' power to enact age discrimination laws under the Fourteenth Amendment.

bargaining agreement requires the county to pay both employer and employee contributions to the Wisconsin Retirement Fund. Art. XV, p. 9. The agreement promises to keep in effect all practices to which it does not specifically refer. Art. VIII, p. 6. Wisconsin law permits the county to retire employees at 65, and the County Personnel Policy so requires. Thus, argues the county, employees who work under the collective bargaining agreement have given their implied consent to retire at 65 in exchange for the county's payments into the Retirement Fund.

The ADEA requires a different conclusion. Section 4(f)(2) provides that "no ... employee benefit plan shall require or permit the involuntary retirement of any individual specified by Section 631(a) of this title because of the age of such individual." 29 U.S.C. § 623(f)(2). Section 4(f)(2) eliminates the County's right to assert implied consent as a defense. Furthermore, employment discrimination protections create individual rights that cannot be waived through collective bargaining. *Alexander v. Gardner-Denver*, 415 U.S. 36, 51, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147 (1974). While *Gardner-Denver* was based on Title VII, the Supreme Court recently extended that holding to the FLSA. *Barrentine v. Arkansas-Best Freight System*, —— U.S. ——, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981). Based on the earlier sections of this opinion, the same principle applies to the ADEA. Ruth Schabach made no implied consent to an early, forced retirement.

### CONCLUSION

Therefore, the Age Discrimination in Employment Act may constitutionally be applied to Calumet County. The County shall be permanently enjoined from requiring the retirement of Ruth Schabach on the basis of age before she reaches 70 years of age. SO ORDERED.

### ON MOTION TO AMEND

The plaintiff Equal Employment Opportunity Commission (EEOC) has moved, pursuant to Rules 59 and 60 of the Federal Rules of Civil Procedure, to amend my June 12, 1981, decision and order.

The EEOC seeks to delete the words "like police officers" from the sentence on page 13, lines 15–18, which reads: "Yet, the ADEA's prohibition of arbitrary age discrimination does not affect the County's ability to force the early retirement of employees, like police officers, for whom age is a bona fide occupational qualification." The bona fide occupational qualification (b.f.o.q.) exemption of the ADEA, 29 U.S.C. § 623(f)(1), was cited following that sentence.

The EEOC makes its request because it presently has four separate cases pending in Wisconsin that focus on whether age is a b.f.o.q. for police officers. On page two of my decision, I specifically noted that the b.f.o.q. exemption was not an issue in the case. Therefore, the statement that causes the concern is dicta. Accordingly, I see no reason to amend the decision. The motions are denied.

SO ORDERED.