686 F.2d 1249
 29 Fair Empl.Prac.Cas. 1020,
29 Empl. Prac. Dec. P 32,995,
3 Employee Benefits Ca 2065
U. S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellee,
v.
COUNTY OF CALUMET, Defendant-Appellant.
 No. 81-2120.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 7, 1982.
Decided Aug. 20, 1982.
 
 James Ungrodt, Calumet County Corp. Counsel, Kiel, Wis., for defendant-appellant.
 Kenneth J. Burchfield, Appellate Div., Gen. Counsel E. E. O. C., Washington, D. C., for plaintiff-appellee.
 Before WOOD, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and MORGAN*, Senior District Judge.
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 Section 28 of the Fair Labor Standards Amendments of 1974, Pub.L.No. 93-259, 88 Stat. 55, amended the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq., (ADEA) to prohibit state and local governments from discriminating in employment against individuals older than forty but younger than seventy. As an employer, a state or local government may not discharge or involuntarily retire an employee falling within that age bracket solely because of age, 29 U.S.C. § 623(a)(1). The grievant, Ruth Schabach, is the deputy clerk of courts in Calumet County, Wisconsin. She is 65 years old. The parties stipulate that Mrs. Schabach competently performs her duties.
 
 
 2
 The deputy clerk in Calumet County is an unelected position subject to the County personnel rule requiring retirement from County employment at age 65. When notified of the County's intention to compel her retirement, Mrs. Schabach filed a complaint with the Equal Employment Opportunity Commission (EEOC). The EEOC, pursuant to 29 U.S.C. § 626(b), filed this action in the district court, contending that the County retirement policy violated §§ 4(a)(1), (2) of the ADEA, 29 U.S.C. §§ 623(a)(1), (2). On the basis of the parties' stipulated facts, the district court, 519 F.Supp. 195, agreed and permanently enjoined the County from involuntarily retiring Mrs. Schabach before age seventy. The County appeals the decision. We affirm.
 
 I.
 
 3
 The appellant maintains that section 28 of the 1974 amendments to the ADEA is unconstitutional. It contends that in amending the ADEA to cover employees of state and local governments, Congress exercised its authority under the Commerce Clause rather than section 5 of the Fourteenth Amendment and that, in light of the Supreme Court decision in National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the use of that power was unconstitutional under the Tenth Amendment. The appellant offers two arguments to support this position.
 
 
 4
 First, appellant contends the amendment must have been passed under the Commerce Clause because Congress lacked the authority to pass it under section 5 of the Fourteenth Amendment. The appellant relies heavily on Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), where the Supreme Court held a state law requiring state police officers to retire at age 50 did not violate the Equal Protection Clause. In Murgia, the Court found that employment by the state was not a fundamental right and concluded that a rational relation existed between the state's interest in protecting the public and the rule requiring police officers to retire at 50. From Murgia, appellant argues that since the Supreme Court has concluded that a state involuntary retirement statute similar to the County policy at issue here does not violate the Equal Protection Clause, Congress had no authority under section 5 to prohibit such a policy through the ADEA.[1]
 
 
 5
 This argument was considered and dismissed in Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). The Court there held that in examining congressional authority to legislate under section 5, the proper focus is on whether the legislation was "appropriate" under the Fourteenth Amendment rather than whether the state conduct prohibited in the legislation violated the Equal Protection Clause or other provisions of the Fourteenth Amendment. Morgan involved a challenge to congressional authority under section 5 to pass section 4(e) of the Voting Rights Act of 1965, 42 U.S.C. § 1973b(e) (1964), which prohibited states from imposing a literacy test as a condition to eligibility for voting. The plaintiffs, registered voters in New York City, argued the New York literacy test, which required all Puerto Ricans legally residing in the state to be able to read English before voting in state elections, did not violate the Equal Protection Clause and therefore was beyond the reach of congressional power under section 5. The court held:
 
 
 6
 Neither the language nor history of § 5 supports such a construction. As was said with regard to § 5 in Ex parte Virginia, 100 U.S. 339, 346, 25 L.Ed. 676, "It is the power of Congress which has been enlarged. Congress is authorized to enforce the prohibitions by appropriate legislation. Some legislation is contemplated to make the amendments fully effective." A construction of § 5 that would require a judicial determination that the enforcement of the state law precluded by Congress violated the Amendment, as a condition of sustaining the congressional enactment, would depreciate both congressional resourcefulness and congressional responsibility for implementing the Amendment. It would confine the legislative power in this context to the insignificant role of abrogating only those state laws that the judicial branch was prepared to adjudge unconstitutional, or of merely informing the judgment of the judiciary by particularizing the "majestic generalities" of § 1 of the Amendment.
 
 
 7
 Id. at 648-49.
 
 
 8
 Under Morgan, the proper question is whether the ADEA as applied to state and local governments is "appropriate" legislation under section 5 to enforce the Equal Protection Clause. Legislation is appropriate if it is "plainly adapted" to enforce the Fourteenth Amendment and is "not prohibited by but is consistent with the 'letter and spirit of the constitution.' " Id. at 651. The appellants do not seriously challenge the ability of the ADEA to satisfy this test. This court recently held in EEOC v. Elrod, 674 F.2d 601, at 609 (7th Cir. March 16, 1982), that the law is plainly sufficient. Congress is given great deference in selecting the measures necessary and appropriate to secure the guarantees of the Fourteenth Amendment. Morgan, 384 U.S. at 651, 86 S.Ct. at 1723; Bond v. Stanton, 555 F.2d 172, 175 (7th Cir. 1977), cert. denied, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978). As the Act protects a class of individuals vulnerable to disparate and adverse treatment in state employment practices, while making exception for discharges or involuntary retirements genuinely based on bona fide occupational considerations, see 29 U.S.C. § 623(f)(1), it is narrowly drawn to reach the traditional Equal Protection goal of protecting a discrete class of individuals from arbitrary and capricious action by the state. Therefore, the appellant's argument that Congress lacked authority to pass the 1974 amendment to the ADEA under section 5 of the Fourteenth Amendment necessarily fails.
 
 
 9
 The appellant also argues that, regardless of congressional authority to legislate under section 5, the legislative history behind the 1974 amendment to the ADEA indicates Congress intentionally acted under its Commerce Clause powers. The ADEA, originally passed in 1967 under the Commerce Clause, see Pub.L.No. 90-202, 81 Stat. 602, was amended to apply to state and local governments in 1974. The amendment was part of a broader legislation, see Fair Labor Standards Amendments of 1974, Pub.L.No. 93-259, § 28, 88 Stat. 74, which, among other things, extended the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201 et seq., to state and local governments as employers. The legislative history behind the amendment to the ADEA is virtually non-existent, and Congress articulated no particular authority under which it extended the ADEA to the states. However, the appellants rely on two segments of the history of the Fair Labor Standards Amendments of 1974 to support their contention that Congress enacted the entire legislation under the Commerce Clause. First, Congress incorporated the statement of purposes in the Fair Labor Standards Act of 1938, which was passed under the Commerce Clause, into the statement of purposes prefacing the amendments to that Act in 1974. Second, Congress also cited the specific purposes of the amendments as:
 
 
 10
 The bill seeks to implement the policy of the (Fair Labor Standards) Act (of 1938) by ... extending the benefits and protection of the Act to workers engaged in commerce or in the production of goods for commerce, or employed in enterprises engaged in commerce or in the production of goods for commerce.
 
 
 11
 H.R.Rep.No. 913, 93d Cong., 2d Sess., reprinted in (1974) U.S.Code Cong. & Ad.News 2811, 2812. The appellant contends, therefore, that because the legislative history behind the Fair Labor Standards Act Amendments of 1974 indicates Congress intended to use the Commerce Clause as the general basis of authority for enacting the legislation, it follows that Congress also intended to extend the ADEA to state governments under the Commerce Clause.
 
 
 12
 The identical argument was recently addressed in Elrod, at 604-609, where this court concluded Congress acted under section 5 in extending ADEA to state and local employees. In Elrod we concluded that the long history behind congressional efforts to extend age discrimination legislation to the states was strong evidence that Congress acted under section 5. Most prominent in the history was congressional concern with discrimination and that inaccurate stereotypes of the abilities of older workers dominated state employment decisions, producing irrational policies with very costly effects on individual employees. This was the foremost concern of the house committee studying the legislation and of Senator Bentsen, the amendment's sponsor. Id. at 6. Noticeably absent from the history is any expression of Congressional concern about the effects these arbitrary employment decisions may have had on interstate commerce.
 
 
 13
 The close resemblance between the ADEA and Title VII is also significant. The ADEA was modeled on Title VII, which was passed in 1964 under the Commerce Clause, and then expressly extended to the state and local governments under section 5 in 1972. Id. at 10. A prohibition against age discrimination in employment was included in the early drafts of Title VII but removed before passage because age discrimination carried unique features which, unlike other forms of discrimination, required further study. The prohibitions of the ADEA were ultimately taken in haec verba from Title VII and the similarities between the two laws have not gone unnoticed. Lorillard v. Pons, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978). Since congressional action behind Title VII followed a pattern, prohibiting employment discrimination by private individuals under the Commerce Clause and then extending the prohibition to state and local governments under section 5, it is unreasonable to believe Congress intended to deviate from this pattern for the ADEA, an act obviously modeled on Title VII. Id.
 
 
 14
 Finally, we held in Elrod that it is also unreasonable to believe Congress, in amending the ADEA, would deviate from a pattern it invariably followed in legislating on discrimination. In the course of enacting modern civil rights legislation, Congress has reached private discrimination indirectly through the Commerce Clause but state discrimination directly through the Fourteenth Amendment. There is little reason to assume that Congress departed from this pattern when, though it articulated its purpose in traditional equal protection terms, it neglected to expressly identify the Fourteenth Amendment as the basis of its power in passing the amendment to the ADEA. Id. at 606-607.[2]II.
 
 
 15
 The appellant also contends the grievant relinquished her rights under the ADEA in the collective bargaining agreement between her union, representing County maintenance and clerical employees, and the County. The appellant bases the argument on two clauses in the collective bargaining agreement. The first is the County's promise under Article XV of the agreement to contribute the employee's as well as its own share to the employee retirement fund. The second is contained in Article VII which provides:
 
 
 16
 The employer agrees that all amenities and practices now in effect but not specifically referred to in this Agreement shall continue for the duration of this Agreement.
 
 
 17
 and which, the appellant contends, contains the employees' agreement to follow the County retirement policy. The appellant argues these two provisions show that the employees surrendered their rights under the ADEA by exchanging their promise to continue working under the County retirement rule for the County's promise to finance the retirement fund without calling on its workers for contributions.
 
 
 18
 Article VII does not support the appellant's contention. Article VII does not make any reference to employee rights under the ADEA. Nor does it contain any express promise by the employees to waive those rights or to abide by the current retirement rule. Article VII contains only the County's promise to observe all "amenities and practices" in effect in the past but not expressly preserved in the agreement. Any promise by the employees in that provision can only be implied and must, therefore, be found in the language and circumstances of the agreement. Considered in context, Article VII does not support this inference.
 
 
 19
 Article VII contains the "management rights" provision of the collective bargaining agreement.[3] It reserves to the County broad control over the terms and conditions of employment. Article VII gives the County authority to hire, promote, transfer, demote, or suspend employees and to discharge employees for proper cause, lack of work, or "other legitimate reasons." Read in the full context of Article VII, the clause in Article VII, which the appellant argues binds its employees to the current retirement policy and nullifies the protections of the ADEA, actually has no such effect. The clause is no more than a limitation on the County's broad authority under the management rights clause. It merely indicates that the employees retain rights and benefits currently in effect though unexpressed in the collective bargaining agreement. Presumably this prohibits the County from unilaterally altering the retirement policy. It does not follow from this, however, that the employees waived, by agreeing to the clause, congressional power to alter the retirement policy on their behalf. We, therefore, do not read this concession by the County to the limitation of its authority under the management rights clause as an additional and unstated relinquishment by the employees of their federal rights and remedies under the ADEA to be free from discrimination in employment based on their age.
 
 
 20
 However, even assuming that the union waived these rights in the labor contract, that action is invalid. Ordinarily, the terms of a collective bargaining agreement are immaterial under the national labor relations policy. NLRB v. American National Insurance Co., 343 U.S. 395, 401-03, 72 S.Ct. 824, 828-29, 96 L.Ed. 1027 (1952); see 29 U.S.C. § 158(d). The National Labor Relations Act, 29 U.S.C. §§ 151 et seq., does not regulate terms or conditions of employment in the unionized work place, and the parties, not obliged to agree to any contract, are left alone in negotiating an agreement. The predominant concern of national labor relations policy is promoting industrial peace. Therefore, intervention in the collective bargaining process is generally confined to imposing an obligation on both parties to bargain in good faith and forestalling a breakdown of contract talks due to the intransigence of one or both parties. American National Insurance Co., 343 U.S. at 402-03, 72 S.Ct. at 828-29, see also Charles D. Bonanno Linen Service, Inc. v. NLRB, 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982). Consequently the courts will not modify the terms of an agreement simply because one party possessed superior bargaining leverage or the agreement itself appears unfair. One exception involves terms in a collective bargaining agreement which attempt to modify or suspend federal legislation regulating the fair, safe, or efficient operation of the workplace.[4] The employer and the union cannot agree to terms in a labor contract which violate separate federal statutes or regulations or policies contained in the National Labor Relations Act, 29 U.S.C. §§ 151 et seq. "The terms of any collective bargaining agreement must comply with federal laws that prohibit discrimination on grounds of race, color, religion, sex, or national origin; that protect veterans; that regulate certain industries; and that preserve our competitive economy." UMWA Health and Retirement Fund v. Robinson, --- U.S. ----, ----, 102 S.Ct. 1226, 1234, 71 L.Ed.2d 419 (1982) (citations omitted); see also M. Finkin, The Limits of Majority Rule in Collective Bargaining, 64 Minn.L.Rev. 183, 188-89 (1980).
 
 
 21
 The Supreme Court in Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), prohibited a union from waiving an individual member's cause of action under Title VII in the collective bargaining agreement.
 
 
 22
 We are also unable to accept the proposition that petitioner waived his cause of action under Title VII. To begin, we think it clear that there can be no prospective waiver of an employee's rights under Title VII. It is true, of course, that a union may waive certain statutory rights related to collective activity, such as the right to strike. These rights are conferred on employees collectively to foster the processes of bargaining and properly may be exercised or relinquished by the union as collective-bargaining agent to obtain economic benefits for union members. Title VII, on the other hand, stands on plainly different ground; it concerns not majoritarian processes, but an individual's right to equal employment opportunities. Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices. Of necessity, the rights conferred can form no part of the collective-bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII. In these circumstances, an employee's rights under Title VII are not susceptible of prospective waiver.
 
 
 23
 Id. at 51-52, 94 S.Ct. at 1021 (citations omitted).
 
 
 24
 It is plain from the decision in Alexander that individual statutory rights to be free from employment discrimination are not to be left to the control of individual unions, institutions which have, on occasion, shown a sensitivity to the rights of the majority of the union membership and an insensitivity to the rights of the minority. Emporium Capwell Co. v. Community Organization, 420 U.S. 50, 62, 95 S.Ct. 977, 984, 43 L.Ed.2d 12 (1974). Rights conferred by Congress on a class of individuals vulnerable to discrimination are endangered if they may be waived by a majority vote, and because the principle of majority rule is central to the collective bargaining process, the possibility always exists-by design-that the majority will subordinate the interests of the minority.
 
 
 25
 Central to the policy of fostering collective bargaining, where the employees elect that course, is the principle of majority rule.... In establishing a regime of majority rule, Congress sought to secure to all members of the unit the benefits of their collective strength and bargaining power, in full awareness that the superior strength of some individuals or groups might be subordinated to the interests of the majority.
 
 
 26
 Id. (Citations omitted).
 
 
 27
 The Court held, however, that in enacting Title VII Congress created substantive goals for individuals superior to the employees' collective ability to bargain effectively. Consequently, the principle of majority rule, however central to the national labor relations policy, is on occasion subordinate to the rights of individual employees. This is true of age discrimination in the workplace, where younger workers invariably outnumber those near retirement age and the best interests of younger and older workers naturally conflict. Advancement by younger employees in salary, responsibility, and seniority, for example, can be delayed by an older worker's hesitancy to retire. Conversely, job security, firings and layoffs often depend, especially in a unionized plant or office, on experience and years of service. Thus, the decision in Alexander extends to the ADEA. Aside from their close historical and legislative relationship and similar prohibitions against employment discrimination, the ADEA and Title VII confer individual rights on employees of state and local governments to equal employment opportunities.
 
 
 28
 Allowing the union here to waive individual rights under the ADEA frustrates the fundamental purpose behind the Act.[5] It leaves many workers in the unionized sector of the economy vulnerable to job discrimination based on their age. Implementation of the Act in the unionized workplace would be sporadic and unpredictable, depending almost entirely on the economic bargaining strength of the union, the incentives offered in exchange for these statutorily conferred rights, and the intensity of management attitudes toward the Act. In addition, applicability of the Act would not result after well-researched and thoroughly debated decisions on the issue in Congress, but would rest with individual union negotiators whose views may be uninformed, whose judgment may be poor, and whose decisions in negotiations are checked only by a majority vote of the union membership.
 
 
 29
 In fact, it appears from the collective bargaining agreement before us that the union may have sacrificed the rights of individual members near retirement age in order to better the common good of the membership. The County asserts that, in exchange for the right to require retirement at 65, it assumed full responsibility in the labor contract for financing the retirement fund. Prior to the labor agreement, the burden of financing the retirement plan fell, in part, on all County employees, the majority of whom are not near retirement age, may change jobs before reaching that age, and at least will not feel the full impact of the retirement policy for many years. In return for this, the union allegedly exchanged the rights under the ADEA of a few members near retirement age. Thus by all indications, the union bartered the individual rights of a few members in order to reduce the financial obligations of many others.
 
 
 30
 Congress clearly did not envision this result when it enacted the ADEA. The Act and the legislative history behind the 1978 amendments, see Pub.L. 95-256, 92 Stat. 189, indicate Congress intended to prohibit the negotiation of and, if necessary, to invalidate portions of a collective bargaining agreement requiring retirement before age 70. 29 U.S.C. § 623(f)(2) provides in pertinent part:
 
 
 31
 (f) It shall not be unlawful for an employer ...
 
 
 32
 (2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, ... except no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual specified by section 631(a) of this title because of age of such individual....
 
 
 33
 The statute plainly forbids incorporating a retirement plan which effectively circumvents the ADEA in the collective bargaining agreement. However, in establishing that provision, Congress recognized that valuable consideration is sometimes given in collective bargaining for concessions which may be prohibited under the ADEA. Congress allowed for this loss in section 2(b) of the 1978 amendment to the Act, Pub.L. 95-256, 92 Stat. 189, by delaying application of the ADEA for plans negotiated and in effect before the Act was passed. The collective bargaining agreement before us, effective January 1, 1979, does not fall within this narrow exception and is fully controlled by 29 U.S.C. § 623(f)(2).[6]
 
 
 34
 For the foregoing reasons, the decision of the district court is affirmed.
 
 
 35
 Affirmed.
 
 
 36
 FAIRCHILD, Senior Circuit Judge, concurring.
 
 
 37
 I fully join in Part I of Judge Wood's opinion. As to the waiver argument discussed in Part II, I would simply hold that the language in the collective bargaining agreement concerning continuance of "all amenities and practices now in effect" is, in any event, insufficiently specific to constitute a waiver of the federal statutory rights in question or to be deemed a consent to retire at 65.
 
 
 
 *
 Honorable Robert D. Morgan, Senior District Judge of the Central District of Illinois, is sitting by designation
 
 
 [1]
 Section 5 of the Fourteenth Amendment enabled Congress to pass legislation enforcing the substantive provisions of the Fourteenth Amendment. It provides:
 The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.
 Section 5 increased the authority of the Congress, while at the same time diminishing the insularity of the states from federal substantive legislation. Katzenbach v. Morgan, 384 U.S. 641, 648, 86 S.Ct. 1717, 1722, 16 L.Ed.2d 828 (1966).
 
 
 [2]
 We need not discuss the appellant's alternate argument that extending the ADEA to the states violated the Tenth Amendment. The Tenth Amendment is necessarily subordinate to the Fourteenth and does not constrain Congressional authority to act under section 5. "(P)rinciples of federalism that might otherwise be an obstacle to congressional authority are necessarily overridden by the power to enforce the Civil War Amendments 'by appropriate legislation.' Those Amendments were specifically designed as an expansion of federal power and an intrusion on state sovereignty." City of Rome v. United States, 446 U.S. 156, 179, 100 S.Ct. 1548, 1563, 64 L.Ed.2d 119 (1979). In addition, we held in EEOC v. Elrod, at 611-612 (7th Cir. March 16, 1982) that because the ADEA does not impair the exercise of a sovereign state function and the federal interest in non-discrimination is far superior to the state interest in making unregulated retirement decisions, the ADEA does not violate the Tenth Amendment
 
 
 [3]
 In full, Article VII provides:
 Article VII-Management Rights Reserved
 Unless otherwise herein provided, the management of the work and the direction of the working force, including the right to hire, promote, transfer, demote or suspend, or otherwise discharge for proper cause, and the right to relieve employees from duty because of lack of work or other legitimate reason is vested exclusively in the Employer. If any action taken by the Employer is proven not to be justified, the employee shall receive all wages and benefits due him for such period of time involved in the matter.
 Calumet County shall have the sole right to contract for any work it chooses and to direct its employees to perform such work wherever located, subject only to the restrictions imposed by this Agreement and the Wisconsin Statutes. But in the event the Employer desires to subcontract any work which will result in the layoff of any County employee, said matter shall first be reviewed with the Union.
 Unless otherwise herein provided, the Employer shall have the explicit right to determine the specific hours of employment and the length of work week and to make such changes in the details of employment of the various employees as it from time to time deems necessary for the effective operation of its department.
 The Employer agrees that all amenities and practices now in effect but not specifically referred to in this Agreement shall continue for the duration of this Agreement.
 
 
 [4]
 Congress and the state legislatures have imposed a number of terms and conditions on private industry to regulate the employment relationship and the operation of the workplace. See, e.g., Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 72 S.Ct. 405, 96 L.Ed. 469 (1952). These include the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq., the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., which regulate general conditions in employment, The Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. §§ 901 et seq., and the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1), which apply to a particular industry or class of employees, and a wide variety of state tort and worker's compensation laws. These statutes often represent the minimum standards under which employees may labor in this society and generally may not be altered in a collective bargaining agreement. See, e.g., Barrentine v. Arkansas-Best Freight System, Inc., 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (Fair Labor Standards Act)
 
 
 [5]
 Mrs. Schabach did not consent to retire early. The County offered her no bonus to do so. The County only argues that the waiver occurred in the collective bargaining agreement and does not contend Mrs. Schabach individually waived rights under the ADEA. Therefore, we do not reach the separate question of whether individual employees may waive rights under the ADEA and whether an agreement between an employer and an individual employee containing the employee's promise to retire early and waive all rights under the ADEA may be so coercive as to amount to an involuntary retirement or discharge under the Act, despite the appearance of the employee's consent. Cf. Ackerman v. Diamond Shamrock Corp., 670 F.2d 66 (6th Cir. 1982)
 
 
 [6]
 It makes no difference that the mandatory retirement provision was originally created by state statute. Though the parties stipulated that state law set the "normal" retirement age at 65 for a deputy clerk of court, Wis.Stat. § 41.02(23), and do not dispute that Wis.Stat. § 41.11(1) allowed the county to retire employees reaching this age, the amendments to the ADEA extending the protections of the Act to state employees invalidated conflicting state statutes
 The County argues, however, that the mandatory retirement provision found new vitality because the parties implicitly incorporated it into the collective bargaining agreement through the management rights clause. Even assuming that the management rights clause has this effect, 29 U.S.C. § 623(f)(2) prohibits this result and because the narrow exception to that provision created in § 2(b) of the 1978 amendments does not apply, the fact that the County may have given valuable consideration for the privilege of retiring its employees before age 70 is also irrelevant.
 In any event, these provisions of the ADEA are most significant because they stand plainly opposite to the County's assertion that an employer and a union may alter the ADEA in collective bargaining. They indicate that Congress intended to prohibit that result for collective bargaining agreements falling outside § 2(b).