**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellee,**

v.

**Richard ELROD and Philip Hardiman, Defendants-Appellants.**

No. 80–2810.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 7, 1981.

Decided March 16, 1982.

Rehearing and Rehearing En Banc Denied July 23, 1982.

Henry A. Hauser, Asst. State's Atty., Chicago, Ill., for defendants-appellants.

Judy Trent Ellis, E. E. O. C., Washington, D. C., for plaintiff-appellee.

Before PELL, Circuit Judge, FAIRCHILD, Senior Circuit Judge, and SPRECHER, Circuit Judge.

SPRECHER, Circuit Judge.

This case raises the issue of whether the 1974 amendment to the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"), constitutionally extends the proscriptions of the ADEA to state and local governments. The constitutionality of the amendment is challenged in an enforcement proceeding under 15 U.S.C. § 49, brought by the Equal Employment Opportunity Commission ("EEOC") against the Cook County Department of Corrections ("Department"). The EEOC seeks compliance with two administrative subpoenas issued pursuant to the agency's investigative authority under § 7(a) of the ADEA, 29 U.S.C. § 626(a). The district court ordered the Department to comply with the subpoenas, finding that the 1974 amendment was constitutional, and that the subpoenas requested information relevant to the EEOC's investigation of the retirement practices of the Department.

The question before us is whether Congress has acted within its authority in extending the prohibitions of the ADEA to state and local governments. It has been argued that such authority is found in either the Fourteenth Amendment or the Commerce Clause. We hold that the 1974 amendment to the ADEA is a constitutional exercise of Congress' power under § 5 of the Fourteenth Amendment.[1] The EEOC was entitled to investigate the practices of the Department. Because the administrative subpoenas were proper and relevant, we affirm the judgment of the district court.

## I

In 1979 the EEOC began an investigation of the Department's mandatory retirement policy, which requires corrections officers to retire at age 63. The Department responded to the Commission's inquiries by stating that this policy was based on County Ordinance 75-0-16 § 9-3 and was justified as a bona fide occupational qualification ("BFOQ") under § 4(f)(1) of the ADEA, 29 U.S.C. § 623(f)(1). The EEOC additionally sought information concerning individual officers scheduled for involuntary retirement. When the Department refused to provide this information, the EEOC, on September 11, 1979, served two subpoenas on the Department. A subpoena duces tecum requested documents concerning, inter alia, the basis for the retirement policy and the administration of the policy with regard to prior and current employees. A subpoena ad testificandum requested a designated official to testify on the same subject.

On September 14, 1979, the Department notified the EEOC that it would not comply with the subpoenas. The Commission filed an enforcement action under 15 U.S.C. § 49, which is incorporated into § 7(a) of the ADEA, 29 U.S.C. § 626(a), through §§ 9 and 11 of the Fair Labor Standards Act, 29 U.S.C. §§ 209 and 211. The district court issued an order to show cause on October 5, 1979. The Department filed a motion to dismiss on the grounds that the ADEA is unconstitutional as applied to state and local governments, and that the information sought by the subpoenas was irrelevant to the Commission's investigation. On September 17, 1980, the district court held in favor of the EEOC, finding that the ADEA is constitutional as applied to the states and that the subject of the subpoenas was relevant to the Commission's lawful investigation of the Department's mandatory retirement policy.

## II

Section 5 of the Fourteenth Amendment grants Congress broad power to effectuate the goals of the amendment:

---

[1]. Because we find that the 1974 amendment to the ADEA is constitutional under the Fourteenth Amendment, it is not essential for us to consider alternative sources of congressional authority. As is explained in part III of this opinion, however, the ADEA amendment would be a constitutional exercise of Congress' power under the Commerce Clause as well.

Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power.

*Ex Parte Virginia*, 100 U.S. 339, 345–56, 25 L.Ed. 676 (1879). The scope of Congress' power under § 5 is equivalent to that under the necessary and proper clause, U.S.Const., Art. I, § 8, cl. 18. *Katzenbach v. Morgan*, 384 U.S. 641, 650, 86 S.Ct. 1717, 1723, 16 L.Ed.2d 828 (1966). The test of the propriety of legislation under the necessary and proper clause was established in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819):

> Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist[ent] with the letter and spirit of the constitution, are constitutional.

In determining whether the 1974 amendment to the ADEA is "appropriate legislation" under § 5, the inquiry, then, is whether this enactment is "plainly adapted" to the end of enforcing the Equal Protection Clause, and is "not prohibited by but is consistent with 'the letter and spirit of the constitution.'" *Katzenbach v. Morgan*, 384 U.S. at 651, 86 S.Ct. at 1723.

■ Although the legislative history of the 1974 amendment to the ADEA lacks explicit reference to the source of congressional authority to extend the coverage of the Act to state and local government employees, it is clear that the purpose of the legislation was to prohibit arbitrary, discriminatory government conduct that is the very essence of the guarantee of "equal protection of the laws" of the Fourteenth

Amendment. In addition, the development of the ADEA follows the familiar pattern of contemporary civil rights acts in grounding prohibitions against private parties in the Commerce Clause, while reaching government conduct by the more direct route of the Fourteenth Amendment. Thus, the ADEA amendment constitutes "appropriate legislation" under § 5 of the Fourteenth Amendment.

Congress enacted the Age Discrimination in Employment Act of 1967, Pub.L.No. 90–202, 81 Stat. 602, to promote the employment of older persons based on ability, to prohibit arbitrary age discrimination, and to aid in studying the relationship between age and employment. 29 U.S.C. § 621(b). The 1967 Act protected only private sector employees between the ages of 40 and 65. 29 U.S.C. § 631 (amended 1978). The 1974 amendment to the ADEA extended the protection of the Act to federal, state, and local government employees. Fair Labor Standards Amendments of 1974, Pub.L.No. 93–259, § 28, 88 Stat. 74 (amending 29 U.S.C. § 630).[2]

Legislation to extend the ADEA to government employees was first introduced on March 9, 1972, by Senator Bentsen. S. 3318, 92d Cong., 2d Sess. (1972); 118 Cong. Rec. 7745 (1972). Also in March of 1972, Congress considered and passed amendments to Title VII which extended coverage of that act to state and local government employees. Equal Employment Opportunity Act of 1972, Pub.L.No. 92–261, 86 Stat. 103 (amending 42 U.S.C. § 2000e). The Title VII amendments were explicitly passed under § 5 of the Fourteenth Amendment. H.R.Rep.No.92–238, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Ad. News 2137, 2154. In May of 1972, Senator Bentsen again presented his proposed amendment to the ADEA. 118 Cong.Rec. 15894 (1972). The Senator noted the overwhelming approval of the Title VII amend-

**2.** Coverage was extended to state and local employees by amending language in the definitions section of the ADEA. 29 U.S.C. § 630(b) and (c). Federal employees were included in a new § 15, 29 U.S.C. § 633a. Enforcement for

federal employees was committed to the Civil Service Commission, and private actions also were authorized. 29 U.S.C. § 633a(b), (c) and (d).

ments by Congress, and urged similar support for the ADEA amendment, arguing that the principles underlying the Title VII amendments "are directly applicable to the Age Discrimination in Employment Act." *Id.* at 15895. The Senate voted in favor of the ADEA amendment 86–0, but the amendment failed to survive House-Senate conference committees after being attached to two bills. S.Rep.No.93–690, 93d Cong., 2d Sess. 55 (1974); 120 Cong.Rec. 8768 (1974) (remarks of Sen. Bentsen).

In 1974, the ADEA amendment was reintroduced and passed with a group of amendments to the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.* ("FLSA"). Little legislative history exists on the ADEA amendment, however, because the breadth and significance of the amendments to the FLSA overshadowed the ADEA amendment. The amendments to the FLSA extended its coverage to federal, state, and local employees, domestic service employees, and retail and service employees, and included increases in the minimum wage for various classifications of agricultural and non-agricultural workers. H.R.Rep.No.93–913, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad. News 2811, 2812.

The House and Senate committees agreed that the ADEA amendment was "a logical extension of the Committee's decision to extend FLSA coverage to Federal, State, and local government employees." S.Rep. No.93–690, 93d Cong., 2d Sess. 55 (1974); H.R.Rep.No.93–913, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad. News 2811, 2849. Neither the House nor the Senate committees made explicit reference to a specific constitutional provision as authority to extend coverage of the Act. Both committees, however, indicated the congressional purpose in passing the amendment by citing remarks made by the President in 1972 in support of extension of ADEA coverage to the states:

> Discrimination based on age—what some people call 'age-ism'—can be as great an evil in our society as discrimination based on race or religion or any other characteristic which ignores a person's unique status as an individual and treats him or her as a member of some arbitrarily-defined group. Especially in the employment field, discrimination based on age is cruel and self-defeating; it destroys the spirit of those who want to work and it denies the National [sic] the contribution they could make if they were working.

*Id.* In addition, Senator Bentsen, the sponsor of the 1972 amendment, made this comment on the 1974 amendment:

> The passage of this measure [the ADEA amendment] insures that Government employees will be subject to the same protections against arbitrary employment [discrimination] based on age as are employees in the private sector. I am pleased that this long struggle is now ending, and that this provision will be written into law.

120 Cong.Rec. 8768 (1974).

This scant legislative history of the 1974 amendment to the ADEA at minimum indicates a congressional purpose to prevent arbitrary age discrimination within the protected age group by extending the coverage of the Act to state and local governments. The amendment is aimed at irrational, unjustified employment decisions based upon assumptions about the relationship between age and ability which classify older workers as incapable of effective job performance. We think the legislative history is plain that the purpose of the 1974 amendment to the ADEA is to proscribe conduct by state and local governments which violates the guarantee of equal protection under the law. As such the amendment is "appropriate legislation" under § 5 of the Fourteenth Amendment.

This view of congressional purpose is substantiated by the overall legislative history of the ADEA. Congress saw the original legislation, passed in 1967, as filling a gap in federal anti-discrimination law left open when Title VII was passed in 1964.[3] Enact-

---

**3.** Passage of the ADEA in 1967 culminated over a decade of effort to prohibit age discrimi- nation. Age discrimination legislation was pro-

ment of the ADEA thus completed the basic structure of federal protection of equal employment opportunity. The substantive thrust of the 1967 legislation paralleled earlier employment discrimination laws: "We must break down the wholly irrational barriers to employment based on age alone which have been permitted to hinder the older worker in a search for employment opportunity." *Age Discrimination in Employment: Hearings Before the Subcommittee on Labor of the Committee on Labor and Public Welfare, United States Senate,* 90th Cong., 1st Sess. 28 (1967) (statement of Sen. Javits). *See also id.* at 1–3 (statement of Sec. of Labor Wirtz).[4]

Furthermore, the legislative history of the 1978 amendments to the ADEA includes commentary on the nature and purpose of the Act that supports the view that the ADEA is inextricably tied to overall federal policy in insuring equal employment opportunity.[5] "[D]epriving older and still capable Americans of jobs [does not] make any more sense than discriminating in employment against blacks, women, or religious or ethnic minorities." H.R.Rep.No. 95–527, Part I, 95th Cong., 1st Sess., *reprinted in* [1978] 753 Gov't Empl.Rel.Rep. (BNA) 101, 103 (statement of Rep. Paul Findley). The Senate report similarly views age discrimination as part of a pattern of arbitrary employment factors which must be eliminated: "[A]s a matter of basic civil rights people should be treated in employment on the basis of their individual ability to perform a job rather than on the basis of stereotypes about race, sex, or age." S.Rep.

---

posed in the late 1950's, and in the early 1960's Presidents Kennedy and Johnson issued executive orders to discourage age discrimination in federal employment and by federal contractors and subcontractors. *Age Discrimination in Employment: Hearings Before the Subcommittee on Labor of the Committee on Labor and Public Welfare, United States Senate,* 90th Cong., 1st Sess. 23 (1967) [hereinafter cited as *1967 Senate Hearings*] (statement of Sen. Javits); *Age Discrimination in Employment: Hearings Before the General Subcommittee on Labor of the Committee on Education and Labor, House of Representatives,* 90th Cong., 1st Sess. 417 [hereinafter cited as *1967 House Hearings*] (statement of AFL–CIO). *See also* Note, *Age Discrimination in Employment: Correcting a Constitutionally Infirm Legislative Judgment,* 47 S.Cal.L.Rev. 1311, 1324–27 (1974). It was suggested that age be included as a protected classification when Title VII was under consideration as part of the Civil Rights Act of 1964. *Id.* at 1328. While age was not included in the prohibitions of Title VII, section 715 of the Civil Rights Act of 1964 directed the Secretary of Labor to study age discrimination and submit appropriate legislative recommendations. 42 U.S.C. § 2000e–14; H.R. Rep. No. 805, 90th Cong., 1st Sess., *reprinted in* [1967] U.S.Code Cong. & Ad.News 2213, 2214. In compliance with that directive, the Secretary issued a report in 1965, *The Older American Worker— Age Discrimination in Employment,* which documented widespread age discrimination and strongly urged the need for federal policy in this area. Congress directed the Secretary under § 606 of Public Law 89–601, 80 Stat. 845 (Fair Labor Standards Amendments of 1966), to submit specific legislative recommendations pursuant to the 1965 report. A bill recommended by the President in his "Older Ameri-

can" Message of January 13, 1967, was transmitted to the Congress in February, 1967. H.R. Rep. No. 805, 90th Cong., 1st Sess., *reprinted in* [1967] U.S.Code Cong. & Ad.News 2213, 2214.

**4.** As enacted, those sections of the 1967 Act which prohibit age discrimination against those aged 40 to 65 in hiring, discharge, and other terms and conditions of employment closely track the comparable provisions of Title VII. *Compare* 29 U.S.C. § 623 *with* 42 U.S.C. § 2000e–2. The 1967 Act provides for age as a bona fide occupational qualification (BFOQ) similar to Title VII's recognition of valid BFOQs on the basis of sex, national origin, or religion. *Compare* 29 U.S.C. § 623(f)(1) *with* 42 U.S.C. § 2000e–2(e). In addition, the 1967 Act reflects Congress' judgment that age discrimination against older workers could be alleviated by educating employers and employees about the myths and realities of the relationship between age and job capability. *See 1967 House Hearings, supra* note 4, at 49 (statement of Secretary of Labor Writz). Section 624 of the Act directs the Secretary of Labor to study and report to Congress on involuntary retirement, and § 622 of the Act requires the Secretary to undertake studies and education efforts for the benefit of employers, unions and the general public.

**5.** The 1978 amendments to the ADEA raised the upper age covered by the Act from 65 to 70, prohibited forced retirement before 70, and effected several procedural changes in enforcement of the Act. Age Discrimination in Employment Act Amendments of 1978, Pub.L.No. 95–256, 92 Stat. 189. Unlike the 1974 amendment, these amendments generated considerable debate.

No.95–493, 95th Cong., 2d Sess., *reprinted in* [1978] U.S.Code Cong. & Ad.News 504, 506.

The overall legislative history of the ADEA therefore confirms that Congress' purpose in extending the ADEA to state and local governments was to prohibit discriminatory conduct and insure equal treatment to older citizens. The objective of this enactment is clearly "appropriate legislation" under § 5 of the Fourteenth Amendment.

We are further persuaded that Congress acted under its Fourteenth Amendment authority by looking to the structure of the ADEA, as well as to the chronology of its development. These factors evince a pattern which parallels that of modern civil rights legislation, which has based congressional authority to reach private conduct on the Commerce Clause, while grounding prohibitions of government conduct in the Fourteenth Amendment. *E.g.*, Civil Rights Act of 1964, Pub.L.No. 88–352, 78 Stat. 243, 42 U.S.C. §§ 2000a–2000h; *see* S.Rep.No. 872, 88th Cong., 2d Sess., *reprinted in* [1964] U.S.Code Cong. & Ad.News 2355. This pattern is necessitated by the Supreme Court's holding in the *Civil Rights Cases*, 109 U.S. 3, 13, 3 S.Ct. 18, 22, 27 L.Ed. 835 (1883), that the Fourteenth Amendment only applies to "State laws and acts done under State authority." Because this appears to preclude legislating in regard to private conduct under the Fourteenth Amendment, unless such conduct is the equivalent of "state action," the Commerce Clause has been used as an alternate source of authority for anti-discrimination laws aimed at private conduct. This anomalous basis of authority is not required, however, when the prohibition of discrimination is directed to the states.

Title VII provides a clear example of this pattern. When originally enacted in 1964, Title VII reached only private conduct and was explicitly based on the Commerce Clause. 42 U.S.C. § 2000e (amended 1972). *See* S.Rep.No.872, 88th Cong., 2d Sess., *reprinted in* [1964] U.S.Code Cong. & Ad.

News 2355, 2366–2368. In 1972, however, when Congress amended the Act to extend its coverage to state and local employees, the basis for the legislation was clearly § 5 of the Fourteenth Amendment. Equal Employment Opportunity Act of 1972, Pub. L.No. 92–261, § 2, 92d Cong., 2d Sess., 86 Stat. 103. *See* H.R.Rep.No. 92–238, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Ad.News 2137, 2154.

We find the history of Title VII particularly helpful because it is the legislation which most closely parallels the ADEA. As the Supreme Court noted in *Lorillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978):

> There are important similarities between [Title VII and the ADEA], ... both in their aims—the elimination of discrimination from the workplace—and in their substantive prohibitions. In fact, the prohibitions of the ADEA were derived *in haec verba* from Title VII.

*See also Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 755, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979). Certainly the sponsor of the ADEA amendment, Senator Bentsen, viewed the amendment as parallel to the 1972 amendment extending the coverage of Title VII to government employees. 118 Cong.Rec. 15895 (1972). The substantive similarity between the two acts would suggest that the source of congressional authority is the same for both.

The ADEA indeed followed the same legislative pattern as Title VII. The original Act reached only private conduct and included the requisite findings to base the legislation on the Commerce Clause. 29 U.S.C. § 630 (amended 1974); 29 U.S.C. § 621. Extension of the Act to the states was originally proposed in 1972 at the same time that the Title VII amendments to accomplish the same end were under consideration by Congress. The final enactment of the ADEA amendment in 1974 completed coverage of public employees on the same basis as private employees. 29 U.S.C. § 630.[6] The 1974 ADEA amendment differs from the 1972 Title VII amendments only in lacking explicit reference to the

---

**6.** Another argument raised by the Department is that Congress had no authority to proscribe

Fourteenth Amendment. But the test of whether legislation is enacted pursuant to § 5 of the Fourteenth Amendment requires no talismanic intoning of the amendment. *See, e.g., Fullilove v. Klutznick,* 448 U.S. 448, 476–78, 100 S.Ct. 2758, 2773–75, 65 L.Ed.2d 902 (1980).[7] Rather, the inquiry is whether the *objectives* of the legislation are within Congress' power under the amendment. *Id.* at 473, 100 S.Ct. at 2772.[8] The objectives of the 1974 amendment to the ADEA are clearly tied to the guarantee of

---

conduct in the ADEA which the Supreme Court had found not violative of the Equal Protection Clause. In *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), the Court considered the validity of a Massachusetts law requiring mandatory retirement for police officers at 50. The Court refused to apply strict scrutiny to the statute, finding that older persons did not constitute a suspect class, nor was employment a fundamental right affected by the state's action. *Id.* at 313, 96 S.Ct. at 2566. Applying the rational basis standard of review, the Court easily found the statute constitutional. *Id.* at 314–17, 96 S.Ct. at 2567–68. The Court extended this analysis to Fifth Amendment equal protection challenges based on age discrimination in *Vance v. Bradley,* 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). There the Court upheld mandatory retirement at age 60 for foreign service employees. *Id.* at 112, 99 S.Ct. at 950.

It does not follow, however, that because the Supreme Court found these government policies not to be violations of equal protection that Congress cannot legislate a stricter standard of conduct. Such a conclusion "would confine the legislative power in this context to the insignificant role of abrogating only those state laws that the judicial branch was prepared to adjudge unconstitutional, or of merely informing the judgment of the judiciary by particularizing the 'majesty generalities' of § 1 of the Amendment." *Katzenbach v. Morgan,* 384 U.S. 641, 648–49, 86 S.Ct. 1717, 1722, 16 L.Ed.2d 828 (1966) (citations omitted). An example of congressional action prohibiting conduct otherwise constitutional is Congress' response to *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), where the Court held that a state disability plan which excluded pregnancy benefits did not violate equal protection. In 1978, Title VII was amended to make such plans unlawful. 42 U.S.C. § 2000e(k).

7. *Fullilove* involved a challenge under the Equal Protection Clause to the minority business enterprise provision (MBE) of the Public Works Employment Act of 1977, whereby 10% of the funds made available to the states for public works projects were to be reserved for qualified minority-owned contractors. Chief Justice Burger, writing for the Court, found that the legislative history indicated Congress' concern and purpose was to aid minority businesses and to insure that those businesses received their fair share of government contracts.

448 U.S. at 456–63, 100 S.Ct. at 2763–67. Congress apparently did not specify what provision of the Constitution was used as a basis for the legislation. The Court determined that an "amalgam" of powers were used. *Id.* at 473, 100 S.Ct. at 2772. In light of the nature of the legislation, imposing conditions on the use of federal funds, the Court found that the Spending Power was used. *Id.* The Court further found that use of the Spending Power was permissible where the objective of the legislation could have been achieved under one of Congress' regulatory powers. *Id.* at 475, 100 S.Ct. at 2773. The Court had no difficulty in finding bases for the objectives of the MBE in the Commerce Clause, where private parties were affected, and in the Fourteenth Amendment, where state and local governments were concerned. *Id.* at 475–78, 100 S.Ct. at 2773–75.

In analyzing the Fourteenth Amendment issue, the Court indicated that the inquiry was focused on the permissible basis for congressional action: "In certain contexts, there are limitations on the reach of the Commerce Power to regulate the actions of state and local governments. To avoid such complications, we look to § 5 of the Fourteenth Amendment for the power to regulate the procurement practices of state and local grantees of federal funds." *Id.* at 476, 100 S.Ct. at 2773 (citations omitted). The Court was unconcerned that the legislative history made no explicit reference to the amendment. *Id.* at 478, 100 S.Ct. at 2775. Rather, the analysis was based on whether the objectives of the act were within the scope of the Fourteenth Amendment. *Id.* at 477–78, 100 S.Ct. at 2774–75.

8. The Supreme Court's recent decision in *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), does not change the analysis to be used in determining whether Congress has enacted legislation pursuant to § 5 of the Fourteenth Amendment. In *Pennhurst,* the Court held that the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 42 U.S.C. § 6000 *et seq.,* did not create substantive rights to minimal treatment which would be subject to judicial enforcement. 101 S.Ct. at 1540. In *dicta* the Court noted that in determining Congress' intent to act under the Fourteenth Amendment, the Court should proceed cautiously: "Because such legislation imposes congressional policy on a State involuntarily, and because it often intrudes on traditional state authority, we

the Equal Protection Clause of the Fourteenth Amendment. Thus, the legislative pattern of the ADEA's passage supports the view that Congress was acting under § 5 of the Fourteenth Amendment to reach government conduct.

We conclude that the 1974 amendment is "appropriate legislation" under § 5 of the Fourteenth Amendment.[9] The result of this exercise of congressional authority under § 5 is clear:

> The prohibitions of the Fourteenth Amendment are directed to the States, and they are to a degree restrictions of State power. It is these which Congress is empowered to enforce, and to enforce against State action, however put forth, whether that action be executive, legislative, or judicial. Such enforcement is no invasion of State sovereignty.

*Ex Parte Virginia*, 100 U.S. 339, 346, 25 L.Ed. 676 (1879). *See also Fitzpatrick v. Bitzer*, 427 U.S. 445, 453–56, 96 S.Ct. 2666, 2670–71, 49 L.Ed.2d 614 (1976).[10] Thus, the effect of our holding is to uphold enforcement of valid proceedings brought against state and local governments pursuant to the Act.

### III

The Department argues that the 1974 ADEA amendment was passed pursuant to

---

should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment." *Id.* at 1539. The Court further suggested that such a view was supported by cases where the Court had found Congress had acted under § 5 of the Fourteenth Amendment based on explicit legislative history. *Id.* The Court then suggested distinguishing two kinds of cases: those where "statutes simply prohibited certain kinds of state conduct," and those like the one before the Court in *Pennhurst*, where the "case for inferring intent is at its weakest where, . . . the rights asserted impose *affirmative* obligations on the States to fund certain services, since we may assume Congress will not implicitly attempt to impose massive financial obligations on the States." *Id.*

Several factors make *Pennhurst* inapposite to our analysis here. First, the Court in *Pennhurst* was resolving an issue of statutory construction, not, as here, a question of congressional authority to legislate. All of the *dicta* on the Fourteenth Amendment are clearly couched in terms of that focus. Second, the case before us is one where the Court has suggested that closer scrutiny of congressional motives is unnecessary: here, the statute merely prohibits conduct and imposes no affirmative obligations on the states. Finally, we note that *Pennhurst* never suggests that a statute could not survive such close scrutiny and expressly states that the question is not reached in regard to the statute at issue in *Pennhurst. Id.* at 1539 n.12.

**9.** Our analysis of the constitutional basis of Congress' authority to extend the ADEA to the states is in accord with the overwhelming majority of courts that have confronted this issue. *Arritt v. Grisell*, 567 F.2d 1267 (4th Cir. 1977); *EEOC v. County of Calumet*, 519 F.Supp. 195 (E.D.Wis.1981), *appeal pending*, No. 81–2120 (7th Cir., argued January 7, 1982); *EEOC v. Florissant Valley Fire Protection District*, 21 FEP Cases (BNA) 973, 21 EPD (CCH) ¶ 30,520

(E.D.Mo.1979) (constitutional under both Fourteenth Amendment and Commerce Clause); *Marshall v. Delaware River and Bay Authority*, 471 F.Supp. 886 (D.Del.1979); *Remmick v. Barnes County*, 435 F.Supp. 914 (D.N.D.1977); *Aaron v. Davis*, 424 F.Supp. 1238 (E.D.Ark. 1976) (constitutional under both Fourteenth Amendment and Commerce Clause); *Usery v. Board of Education of Salt Lake City*, 421 F.Supp. 718 (D.Utah 1976). *Contra, EEOC v. State of Wyoming*, 514 F.Supp. 595 (D.Wyo. 1981), *prob. juris. noted*, —— U.S. ——, 102 S.Ct. 996, 71 L.Ed.2d 291 (1982).

**10.** *Fitzpatrick* concluded that the Eleventh Amendment is limited by the Fourteenth Amendment, 427 U.S. at 456, 96 S.Ct. at 2671. No different result can be reached when the challenge to a statute passed under the Fourteenth Amendment is brought under the Tenth Amendment. As the Court noted in *Fitzpatrick*, the Fourteenth Amendment is a positive limitation on the states' sovereignty. *Id.* at 454, 96 S.Ct. at 2670. Simple logic dictates, then, that the Tenth Amendment is not implicated when Congress acts in an otherwise constitutional manner over an area which is no infringement of state sovereignty and even could be viewed as no longer within the scope of the states' sovereignty. The Court recognized the inapplicability of the Tenth Amendment as a limitation on the Fifteenth Amendment in *City of Rome v. United States*, 446 U.S. 156, 179–80, 100 S.Ct. 1548, 1563–64, 64 L.Ed.2d 119 (1980). Because the scope of the power granted to Congress under § 2 of the Fifteenth Amendment has always been viewed as co-equal with § 5 of the Fourteenth Amendment, *id.* at 178–80, 100 S.Ct. at 1562–64. *South Carolina v. Katzenbach*, 383 U.S. 301, 326–27, 86 S.Ct. 803, 817–18, 15 L.Ed.2d 769 (1966), it follows that the Tenth Amendment cannot limit Congress' power to act under § 5 of the Fourteenth Amendment.

Congress' power under the Commerce Clause and violates the Tenth Amendment limitation on that clause recognized in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). The Department bases its Commerce Clause argument primarily on the inclusion of the 1974 amendment to the ADEA with amendments to the FLSA in the Fair Labor Standards Amendments of 1974. The amendments to the FLSA were passed pursuant to the Commerce Clause, and thus, the Department concludes, the ADEA amendment has the same source of congressional authority.[11] Because the FLSA amendments were declared unconstitutional in *National League of Cities*, the Department argues that the ADEA amendment, as part of the legislation enacting the FLSA amendments, should likewise fail.[12]

Our analysis of the legislative history indicates that passage of the 1974 amendment to the ADEA was firmly within the ambit of congressional authority under § 5 of the Fourteenth Amendment, and that the connection of the ADEA amendment to the legislation enacting FLSA amendments was largely fortuitous. Even were we to accept the Department's contention that the 1974 amendment was passed under the Commerce Clause, however, we would not find the amendment in conflict with the Tenth Amendment.

The crux of this argument is the application of *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). In that case the Court held unconstitutional the 1974 amendments to the FLSA extending coverage of the Act to state and local government employees. "[I]nsofar as the challenged amendments operate to *directly displace* the States' freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted Congress by Art. I, § 8, cl. 3." *Id.* at 852, 96 S.Ct. at 2474 (emphasis added). In analyzing the 1974 FLSA amendments, the Court not only determined that setting the wages and hours of employment was an attribute of state sovereignty, but also found that the state's determinations in this area are "functions essential to separate and independent existence." *Id.* at 845, 96

---

**11.** Only one sentence in the 1974 legislative history arguably supports this analysis. The Senate and House reports on the ADEA amendment make the statement that "The amendment is a logical extension of the committee's decision to extend FLSA coverage to Federal, State, and local government employees." H.R. Rep.No.93-913, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad.News 2811, 2849; S.Rep.No.93-690, 93d Cong., 2d Sess. 55 (1974).

**12.** As additional support for its Commerce Clause argument, the Department points to the undisputed Commerce Clause origin of the 1967 Act. 29 U.S.C. § 621. The reason for use of this source of congressional authority is discussed in part II *supra.*

The Department also notes that enforcement of the ADEA was tied to the pre-existing enforcement structure for the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.;* 29 U.S.C. § 626. During the Senate and House hearings on the Act, the relative merits of placing the ADEA under the EEOC's jurisdiction or in the Wage and Hour Division of the Department of Labor were the subject of considerable testimony. *See, e.g., 1967 Senate Hearings, supra* note 4, at 23, 29, 151; *1967 House Hearings, supra* note 4, at 12-13, 49, 413-14. There was concern that the unique characteristics of age dis-

crimination could not be adequately addressed by the already overburdened EEOC. *Id. See also* H.R.Rep.No. 92-238, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Ad.News 2137, 2139-40. The Wage and Hour Division represented an alternative, existing bureaucracy capable of enforcing the Act, and it also had successfully administered the Equal Pay Act of 1963. 29 U.S.C. § 206(d)(1). These arguments evidently were persuasive, as the ADEA was committed to the supervision of the Secretary of Labor using FLSA procedures. 29 U.S.C. § 626.

In 1978, enforcement of the ADEA was transferred from the Wage and Hour Division to the EEOC under § 2 of the 1978 Reorganization Plan No. 1, 43 Fed.Reg. 19,807 (1978), 92 Stat. 3781, in 5 U.S.C. app., *reprinted in* [1978] U.S. Code Cong. & Ad.News 9799. In November, 1979, the EEOC published guidelines on its approach to enforcement of the ADEA, which included the following statement: "It is the Commission's position that these proposed interpretations be interpreted in a manner which is consistent with Title VII of the Civil Rights Act of 1964." 44 Fed.Reg. 68,858 at 68,858 (1979). *See generally* McKenry, *Enforcement of Age Discrimination in Employment Legislation,* 32 Hastings L.J. 1157 (1981).

S.Ct. at 2471. The crucial nature of state control in this area was tied to the impact of wage and hour determinations on the delivery of traditional, essential governmental services. The Court examined the potential effect of the FLSA, and particularly focused on increased costs, modifications of programs, and reduced delivery of services. *Id.* at 846–48, 96 S.Ct. at 2471–72. The Court found this dramatic impact would "impermissibly interfere with the integral governmental functions of these bodies" and would "significantly alter or displace the States' abilities to structure employer-employee relationships." *Id.* at 851, 96 S.Ct. at 2474.

The majority opinion does not clearly detail the standards which should govern a determination of when the Tenth Amendment limits congressional action under the Commerce Clause. Justice Blackmun, in a concurrence, read the "direct impact" approach of the majority as a balancing test which "does not outlaw federal power ... where the federal interest is demonstrably greater and where state facility compliance with imposed federal standards would be essential." *Id.* at 856, 96 S.Ct. at 2476 (Blackmun, J., concurring). This circuit has read the case narrowly, stressing the unique impact of the FLSA amendments. *See Marshall v. City of Sheboygan*, 577 F.2d 1 (7th Cir. 1978). A broad reading of the case would invite a major restructuring of federal-state relationships which would implicate a long line of precedent, *National League of Cities v. Usery*, 426 U.S. 833, 880–81, 96 S.Ct. 2465, 2487–88, 49 L.Ed.2d 245 (opinion of Stevens, J., dissenting), a result which the majority surely did not intend. *Cf. id.* at 852–53, 96 S.Ct. at 2474 (refusing to

overturn *Fry v. United States*, 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975)).

▪ Using either the "direct impact test" or the "balancing test," the 1974 amendment to the ADEA is a valid exercise of congressional authority that does not violate the Tenth Amendment. Although the ADEA affects the state's employment decisions, which were recognized in *National League of Cities* as an "essential function" of sovereignty, it is questionable whether an interest in arbitrary discrimination on the basis of age is an attribute of that function. Even assuming that the state does have the right to discriminate, the burdening of the state's employment decisions by compliance with the ADEA would result in minimal, if any, costs, and thus would not threaten substantial restructuring of government functions or services. The Act would only affect a limited group of the state's employees, those 40 to 70, not the entire class of government employees, as under the FLSA amendments. This would result in little if any additional cost to the employer.[13] Where age is demonstrably related to effective job performance, the state of course would be free under the BFOQ exemption to use age as an employment factor. 29 U.S.C. § 623(f). Thus, the primary effect of the ADEA would be to modify the permissible criteria in making employment choices. Government is being prohibited from certain conduct, but is not required to assume a burden, financial or otherwise, which substantially interferes with its sovereignty.

Similarly, under a balancing test, the federal interest in non-discrimination and the importance of having that policy uniformly applied in the public and private sectors

---

**13.** Of primary concern to state and local governments, as to private employers, most likely would be added pension costs. In fact, however, pension costs and Social Security could reflect a savings for several reasons:

The longer an employee works, the shorter the period retirement payments will have to be made. Savings would also come from the added years of accumulated interests on the pension assets. Additional savings would arise from the fact that a plan need not provide for further benefit accruals after the

participant reaches the plan's normal retirement age. Added years of service do not necessarily increase the ultimate retirement benefit or the cost of providing it.

S.Rep.No.95–493, 95th Cong., 1st Sess., *reprinted in* [1978] 753 Gov't Empl.Rel.Rep. (BNA) 151, 182 (statement of Sen. Javits). *See also* H.R.Rep.No.95–527, Part I, 95th Cong., 1st Sess., *reprinted in* [1978] 753 Gov't Empl.Rel. Rep. (BNA) 101, 113; S.Rep.No.95–493, 95th Cong., 1st Sess., *reprinted in* [1978] 753 Gov't Empl.Rel.Rep. (BNA) 151, 155, 164–66.

outweighs any state interest in unfettered employment decisions or in arbitrary employment policies. The federal interest in non-discrimination on the basis of age is to eliminate arbitrary, irrational barriers to employment and to insure equal employment opportunity based on merit and ability. The importance of these policies and the finding that federal legislation in this area was necessary underlay the original enactment of the ADEA in 1967. The extension of the ADEA to the states insures uniformity and greater compliance with the ADEA. It also eliminates the anomaly that government is not bound by public policy. As Justice Brennan remarked in a related context: "How 'uniquely amiss' it would be, therefore, if the government itself—'the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct' —were permitted to disavow liability for the injury it has begotten." *Owen v. City of Independence*, 445 U.S. 622, 651, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980). *See also* 118 Cong.Rec. 7745 (1972) (remarks of Sen. Bentsen).

It is noteworthy that the State of Illinois has enacted a Human Rights Act which prohibits employment discrimination on the basis of age. Illinois Human Rights Act, Ill.Rev.Stat. ch. 68, § 1–101 *et seq.*[14] Thus, when we look to the state's interest, it is arguable that there is no conflict with the federal interest in non-discrimination. Even absent this declaration of state policy, however, if the state's interest is in non-interference with its employment decisions, then we think the interference here is slight. As we noted above, no significant burden of increased costs is laid on the state; rather, the state is only limited in making its employment decisions on the basis of arbitrary conclusions about age and ability. Justifiable discrimination on the basis of age is excluded from the prohibitions of the ADEA under the BFOQ exemption. 29 U.S.C. § 623(f). Weighing this limited intrusion into the employment decisions of state and local governments against the federal interest in prohibiting age discrimination, the balance clearly tips in favor of the federal interest.

Therefore, we have no difficulty in concluding that even if the 1974 amendment to the ADEA is viewed as an exercise of Congress' power under the Commerce Clause, the amendment is constitutional and does not conflict with the Tenth Amendment.[15]

14. The state statute prohibits age discrimination in employment against persons 40 to 70 years of age. Ill.Rev.Stat. ch. 68 § 1–103(A). The state is included as an employer subject to the prohibitions of the statute. Ill.Rev.Stat. ch. 68 § 2–101(B)(1)(c); § 2–102(A). Illinois had a separate Age Discrimination Act, Ill.Rev.Stat. ch. 48, §§ 881–887, passed in 1967, which was repealed when the Human Rights Act consolidated all state anti-discrimination statutes in a single statute.

15. Almost all other federal courts which have considered the constitutionality of the 1974 amendment to the ADEA have concluded, when the issue was considered at all, that the ADEA was constitutionally applied to the states if Congress acted under the Commerce Clause. Some courts have used this determination as a basis for holding that the 1974 amendment is constitutional under both the Fourteenth Amendment and the Commerce Clause. *See EEOC v. Florissant Valley Fire Protection Dist.*, 21 FEP Cases (BNA) 973, 21 EPD (CCH) ¶ 30,520 (E.D.Mo.1979); *Aaron v. Davis*, 424 F.Supp. 1238 (E.D.Ark.1976). *Contra, EEOC v. State of Wyoming*, 514 F.Supp.

595 (D.Wyo.1981), *prob. juris. noted*, —— U.S. ——, 102 S.Ct. 996, 71 L.Ed.2d 291 (1982). Other courts have discussed the issue after reaching the conclusion, as we have here, that the sole basis of Congress' authority to enact the 1974 amendment was the Fourteenth Amendment. *See EEOC v. County of Calumet*, 519 F.Supp. 195 (E.D.Wis.1981), *appeal pending*, No. 81–2120 (7th Cir., argued January 7, 1982); *Marshall v. Delaware River & Bay Auth.*, 471 F.Supp. 886 (D.Del.1979); *Usery v. Bd. of Ed. of Salt Lake City*, 421 F.Supp. 718 (D.Utah 1976).

The federal courts, including this circuit, reached similar conclusions when the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1) ("EPA"), was challenged on the basis of *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). The Equal Pay Act incorporates the FLSA to an even greater extent than does the ADEA. In particular the EPA uses the FLSA definitions section. It was the change in definitions which extended the FLSA, and with it the EPA, to state and local government employees under the 1974 amendments to the FLSA. After *Na-*

## IV

Our resolution of the issue of the constitutionality of the ADEA as applied to state and local governments provides the basis for the EEOC to act pursuant to its authority under § 7(a) of the ADEA, 29 U.S.C. § 626(a), to investigate the Department for possible violations of the statute. There is no question that the focus of the EEOC's investigation, mandatory retirement of county corrections officers at age 63, is squarely within the concerns of the statute. The remaining issue to be examined is whether the agency's subpoena to achieve its investigatory purpose was impermissibly broad. The Department claims that the subpoena amounts to "a federal fishing trip into the County's files." Appellant's Brief at 15. In addition to arguing that principles of federalism should limit federal rummaging in state files, the Department argues that its assertion that age is a BFOQ for county corrections officers necessarily circumscribes the EEOC's investigation. The Department claims that the EEOC is not entitled to information on the empirical basis for the mandatory retirement policy nor is it entitled to information on specific individuals retired pursuant to the policy.

An administrative subpoena will be enforced, when challenged on the basis of relevancy, if the material subpoenaed "touches a matter under investigation," *Motorola v. McLain*, 484 F.2d 1339, 1345 (7th Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 287 (1974), and if "the inquiry may be relevant to [a legitimate] purpose." *Powell v. United States*, 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–55, 13 L.Ed.2d 112 (1964). *See also Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 214, 66 S.Ct. 494, 508, 90 L.Ed. 614 (1946); *C. A. B. v. United Airlines*, 542 F.2d 394, 401–02 (7th Cir. 1976); *American International Trading Co. v. Bagley*, 536 F.2d 1196, 1198 (7th Cir. 1976). No different standard exists where state or local governmental bodies are the object of the subpoena. *See, e.g., New Orleans Public Service, Inc. v. Brown*, 507 F.2d 160, 164–65 (5th Cir. 1975); *EEOC v. University of New Mexico*, 504 F.2d 1296, 1301–02 (10th Cir. 1974).

The subpoena at issue here sought documentary information and the testimony of a knowledgeable official concerning the basis for the Department's policy, i.e., whether it was based on medical or other scientific data indicating a correlation between age and the qualifications needed for the job of corrections officer. The subpoena also sought information on specific individuals retired under the policy and on those who would be required to retire in the near future. These were reasonable requests for information to assess whether the Department was in violation of the ADEA or whether its mandatory retirement policy was valid as a BFOQ. The mere assertion by the Department that its policy falls within the BFOQ exemption does not limit the EEOC's investigation. To the contrary, because determination of whether the Department's retirement policy meets the ADEA's BFOQ exemption involves questions of fact, the EEOC must have access to relevant information upon which it can decide whether age actually is a BFOQ for the position of corrections officer. *Hodgson v. Greyhound Lines, Inc.*, 499 F.2d 859 (7th Cir. 1974), *cert. denied*, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 822 (1975). *See F. T. C. v. Shaffner*, 626 F.2d

---

tional League of Cities invalidated the amendments as to the FLSA, the argument was made that the EPA should likewise fail. The specific arguments parallel those before us in this case. The federal courts have unanimously upheld the EPA, with the majority of courts finding the EPA was passed pursuant to the Fourteenth Amendment and thus was not subject to Tenth Amendment attack. *See Marshall v. Owensboro—Daviess County Hospital*, 581 F.2d 116 (6th Cir. 1978); *Usery v. Charleston County School District*, 558 F.2d 1169 (4th Cir. 1977);

*Usery v. Allegheny County Institution District*, 544 F.2d 148 (3d Cir. 1976), *cert. denied*, 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977). This court and others have upheld the EPA even if it is viewed as an exercise of Commerce Clause authority. *See Marshall v. City of Sheboygan*, 577 F.2d 1 (7th Cir. 1978); *Pearce v. Wichita County, etc.*, 590 F.2d 128 (5th Cir. 1979). *See also* Note, *National League of Cities v. Usery: Its Implications for the Equal Pay Act and the Age Discrimination in Employment Act*, 10 U.Mich.J.L.Ref. 239 (1976).

32, 36 (7th Cir. 1980); *F. T. C. v. Feldman*, 532 F.2d 1092, 1096 (7th Cir. 1976).[16]

Thus, we see no reason why the Department should not be required to comply with these requests for information. Accordingly, we Affirm the constitutionality of the ADEA as applied to the states as an exercise of Congress' power under § 5 of the Fourteenth Amendment, and Remand to the district court for proceedings consistent with this opinion.

PELL, Circuit Judge, concurring and dissenting.

I concur and join in the majority opinion with respect to Parts I, II and III. I am in disagreement with the result reached in Part IV of the majority opinion and therefore respectfully dissent. As to that part only I regard the subpoena issued in this case by the EEOC as seeking wide-ranging bureaucratic intrusion into all personnel files of the Cook County Department of Corrections. Indeed, its breadth would seem to indicate that all files were included, not just personnel. The correctness of that observation seems to me to be patent from even a cursory examination of the two and one-half page specification of documents set forth in the subpoena, a copy of which is attached as an appendix to this dissent. The subpoena *duces tecum* is equally wide-ranging. A copy of that document is also attached as an appendix to this dissent.

Failure of the officials of the Department to comply with judicially validated subpoenas, of course, subjects them to the risks of contempt proceedings. Unless the Department has a massive computerized program geared to all of the subtleties of the information requested, I cannot conceive that gathering all of the information required by the documents subpoena and needed for the witness or witnesses on the subpoena *duces tecum* could be accomplished without combing countless records and making numerous judgment calls on whether any particular piece or pieces are within the ambit of the subpoenas. I regard this as an unwarranted intrusion into the affairs of a state instrumentality by the Federal Government, no matter how worthwhile its social objective may be in a particular case.

The Department concedes that it has a compulsory retirement policy with regard to correctional officials at the age of 63. This, by the way, is eight years more than the Federal Government's bona fide occupational qualification application to federal jail guards with identical safety and security qualifications. *See* 5 U.S.C. § 8335. Yet, the problems of safety and security would seem to be common to the two groups of guards. In sum, the subpoenas appear to me to be a plain and simple fishing expedition seeking to go far beyond the bounds of what conceivably could be relevant in determining whether the compulsory retirement age of 63 as to these state law enforcement officials is a bona fide occupational qualification.

While it is true that the majority opinion in the final marginal note recognizes that the court on remand may consider whether specifications are relevant to the EEOC's particular investigatory purpose, it appears to me that this is a case calling for a determination now of whether the agency is abusing its discretion by not initially exploring the bona fide occupational qualifications issue before seeking information which would be wholly irrelevant if a bona fide occupational qualification is legally and correctly applied here. It seems to me the district court should first decide this threshold issue.

While I think enforcement should be denied now because of the overbreadth and lack of showing of relevance, I would at the very least vacate the order and remand for an evidentiary hearing before the district court for a demonstration by the federal agency as to the relevancy of the materials sought on the bona fide occupational qualification issue.

16. No challenge has been raised on appeal to the relevancy of specific items of the subpoenas. Our opinion only addresses the issue of a generalized challenge of overbreadth and lack of relevancy made against the subpoenas as a whole. The court on remand may consider whether specific items are relevant to the EEOC's particular investigatory purpose.

## APPENDIX I

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

SUBPOENA        No. CH 79–32

TO: Cook County Department of Corrections
2700 South California Avenue
Chicago, Illinois  60608

IN THE MATTER OF EEOC v. COOK COUNTY DE-PARTMENT OF CORRECTIONS, No. 051798102—Investigation concerning mandatory retirement of Correctional Officers

Having failed to comply with previous requests made by or on behalf of the undersigned Commission Official,

You Are Hereby Required And Directed To Produce And Bring For Inspection And Copying The Documents Described Below on Friday, September 14, 1979 at 2:00 PM at 55 East Jackson Blvd., Room 1401 Chicago, Illinois

Definitions:

"Document" is defined as including writings, drawings, graphs, charts, photographs, phono-records, notes, memoranda, letters, diaries, recording tapes, or computerized records in usable form.
(See continuation sheets)

On Behalf Of The Commission:

Issuing Official:

Martin Slate, Director

Chicago District Office

536 South Clark Street

Chicago, Illinois 60605

Date:  Sep 11 1979

1. All documents relating to, referring to, reflecting, or in any way discussing the previous retirement policy of the Cook County Department of Corrections before the passage of Cook County Ordinance 75–0–16 on May 5, 1975.

2. All documents which refer to, relate to, or reflect any suggestions, recommendations and/or decisions to enforce the age 63 retirement rule.

3. All documents supporting the reason(s) of the Department of Corrections for enforcing a mandatory retirement age of 63, including but not limited to statistical, medical or scientific studies and job task analyses.

4. All documents notifying any current employee of the Department of Corrections who will have attained the age of 63 on or before October 1, 1979 of his/her retirement date and all documents which describe, relate to or refer to or reflect the reasons for such retirement.

5. With regard to the Department's policy of retirement at age 63, all documents which relate to, refer to, reflect or describe:

a. what the practice has been with regard to employee retirement;

b. all reasons for the decision to enforce the policy;

c. the name, job classification, and business address for each person involved in any decision to enforce the policy and the nature of each person's involvement in any decision; and

6. For each employee of the Department of Corrections who will have attained the age of 63 on or before October 1, 1979, all documents which relate to, refer to, reflect or describe:

a. Name

b. Address and telephone number;

c. Date of birth;

d. Date of Hire;

e. Current job classification, pay rate, rank and/or grade;

f. Current specific work assignments and exact duties and percentage of time spent on each;

g. All previous classifications held with the Department of Corrections and include dates thereof;

h. For each person who supervised the work of the employee, the supervisor's name, job classification, and include dates of supervision of the employee; and

i. If the employee has been notified of a retirement date and, a copy of the notification and the reasons therefor.

7. For each employee named in response to question 6, *supra.*, all documents

which contain appraisals or evaluations of work performance and any other documents which relate to the employee's performance or conduct, whether favorable or adverse (such as disciplinary warnings, letter of commendation, etc.).

8. For each individual named in response to question 6, *supra.,* all documents which relate to, refer to or reflect or describe:

a. All pay rates and the inclusive dates for each pay rate;

b. All changes in rank and/or grade, and the dates of said changes;

c. For each change in pay, rank or grade, the reason(s) for such change, and the weight given to each;

d. The name, job classification, business address of each individual involved in the decision to change the pay rate, rank or grade, for each change referred to in subparts a and b above; and

e. If the employee ever failed to receive a regularly scheduled pay increase or received an increase less than the average increase given to similarly situated individuals produced all documents which relate to, refer to, reflect, or describe the date of the increase, the reason(s) why the individual did not receive the increase, and the names, job classification, and business address of each person involved in the decision.

9. All documents which relate to, refer to, reflect, or describe any instances since December 15, 1967 in which employee has been assigned to any job which is less strenuous and/or less dangerous because of the employee's age or physical condition, including for each instance, for each employee:

a. Name, home address and telephone number;

b. Inclusive dates of said assignment;

c. Date of birth;

d. Previous duties and inclusive dates thereof;

e. Duties to which assigned because of age or physical condition;

f. Reasons for the assignment;

g. Whether the assignment was at the individual's request; and

h. Name, job title, business addresses of persons involved in the decision to reassign.

10. For each person employed by the Department of Corrections who retired at age 60 or older after December 15, 1967, produce all documents which relate to, refer to, reflect, or describe:

a. Name;

b. Date of retirement;

c. Date of birth;

d. Job classification at retirement, together with specific work assignments and exact duties and percentage of time spent on each;

e. Whether retirement was voluntary or involuntary; and

f. If involuntary, reason(s) for the retirement of said individual.

11. Copies of all pension plans and disability benefit plans covering employees of the Department of Corrections in effect since December 15, 1967.

Section 7(a) of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 626(a), provides that the provisions of 15 U.S.C. §§ 49 and 50, as adopted by 29 U.S.C. §§ 209 and 211, are applicable to investigations under the Act. Copies of the applicable statutes are attached hereto.

*Note The Provision For Civil And/Or Criminal Penalties For Failure To Obey A Subpoena of The Commission.*

### APPENDIX II

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

SUBPOENA      No. CH 79-33

TO: Cook County Department of Corrections
2700 South California Avenue
Chicago, Illinois  60608

IN THE MATTER OF EEOC v. COOK COUNTY DEPARTMENT OF CORRECTIONS, No. 051798102— Investigation concerning mandatory retirement of Correctional Officers

Having failed to comply with previous requests made by or on behalf of the undersigned Commission Official,

You Are Hereby Required And Directed To:

Designate one or more persons to testify on your behalf concerning the matters listed below:

You are required to notify Kathryn J. Kaluzny and Sidney Chesnin, attorneys for the Commission, 55 East Jackson Blvd., Room 1401, Chicago, Illinois 60604, telephones 353-6674 or 353-7545, no later than 2:00 PM on Friday, September 14, 1979, of the identity of the persons who will testify and, for each person designated, the matters on which the person will testify. The persons so designated shall testify as to matters known or reasonably available to the Cook County Department of Corrections.

You Are Further Required to produce all persons so designated to testify for oral testimony under oaths before an officer authorized to administer such oath on Monday, September 17, 1979, at 9:00 A.M. at 2700 So. California Avenue, Chicago, Illinois in a suitable room to be designated by the Cook County Department of Corrections.

You are required to notify the above attorneys for the Commission of the exact room location no later than 2:00 PM on Friday, September 14, 1979.

(See continuation sheet.)

Issuing Official:

Martin Slate, Director

Chicago District Office

536 South Clark Street

Chicago, Illinois 60605

The matters concerning which testimony is required are as follows:

1. With regard to the Department of Correction policy requiring mandatory retirement at age 63, the previous policy in effect before the passage of Cook County Ordinance 75-0-16 on May 15, 1975.

2. With regard to the Department's policy of retirement at age 63:

   a. The name, job classification, and business address for each person involved in the decision to retire employees at age 63 and describe the nature of each person's involvement in the decision;

   b. Whether the policy has been enforced consistently;

   c. What the practice has been with regard to employee retirement;

   d. All reasons for the decision to enforce the policy and the description of any documentation or studies supporting the reasons;

   e. The name, job classification, and business address for each person involved in any decision to enforce the policy and a description of the nature of each person's involvement in any decision.

3. For each employee of the Department of Corrections who will have attained the age of 63 on or before October 1, 1979, the employee's:

   a. Name

   b. Address and telephone number;

   c. Date of birth;

   d. Date of hire;

   e. Current job classification, pay rate, rank and/or grade;

   f. Current specific work assignments and exact duties and percentage of time spent on each;

   g. All previous classifications held with the Department of Corrections and include dates thereof;

   h. For each person who supervised the work of the employee, the supervisor's name, job classification, and include dates of supervision of the employee; and

   i. Whether the employee has been notified of a retirement date and, if so, the date and manner of such notification and the reasons therefor.

4. For each individual named in response to question 3, *supra*:

   a. All pay rates and the inclusive dates for each pay rate;

   b. All changes in rank and/or grade, and the dates of said changes;

c. For each change in pay, rank or grade, the reason(s) for such change, and the weight given to each;

d. The name, job classification, business address of each individual involved in the decision to change the pay rate, rank or grade, for each change referred to in subparts a and b above; and

e. If the employee ever failed to receive a regularly scheduled pay increase or received an increase less than the average increase given to similarly situated individuals, the date of the increase, the reason(s) why the individual did not receive the increase, and the names, job classification, and business address of each person involved in the decision.

5. If, since December 15, 1967, any employee has been assigned to any job which is less strenuous and/or less dangerous because of the employee's age or physical condition, and, if so, for each employee:

a. Name, home address and telephone number;

b. Inclusive dates of said assignment;

c. Date of birth;

d. Previous duties and inclusive dates thereof;

e. Duties to which assigned because of age or physical condition;

f. Reasons for the assignment;

g. Whether the assignment was at the individual's request; and

h. Name, job title, business addresses of persons involved in the decision to reassign.

6. For each person employed by the Department of Corrections who retired at age 60 or older after December 15, 1967, the employee's:

a. Name;

b. Date of retirement;

c. Date of birth;

d. Job classification at retirement, together with specific work assignments and exact duties and percentage of time spent on each;

e. Whether retirement was voluntary or involuntary; and

f. If involuntary, reason(s) for the retirement of said individual.

7. Whether any employees of the Department of Corrections are represented by any labor organization and, if so, the name of each organization, its address and telephone number.

Section 7(a) of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 626(a), provides that the provisions of 15 U.S.C. §§ 49 and 50, as adopted by 29 U.S.C. §§ 209 and 211, are applicable to investigations under the Act. Copies of the applicable statutes are attached hereto.

*Note The Provision For Civil And/Or Criminal Penalties For Failure To Obey A Subpoena Of The Commission.*